## ZOTOS CORPORATION v. RADER.
### No. 449.

Circuit Court of Appeals, Second Circuit.
July 26, 1937.

Harrison F. Lyman, of Boston, Mass., John E. Stryker, Jr., of St. Paul, Minn., and C. E. Hammett, Jr., and Fish, Richardson & Neave, all of Boston, Mass. (Henry R. Ashton, of New York City, of counsel), for appellant.

Richard E. Marine and Thomas J. Byrne, both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree for the plaintiff entered on the usual bill in equity upon three patents. Ralph L. Evans is the inventor of all three; on January 21, 1932, he filed an application out of which came the patent last to be issued, No. 1,919,690; the other two were divisions of this application, and may be ignored in the view which we take of the original, The invention was for a means of waving women's hair, consisting of a little pad containing a chemical which would generate heat when wetted. The pad was made up of a wrapper, a perforated envelope containing the chemical, a wet absorbent sheet next to the envelope, and a perforated flap to hold the two together. The pad was rolled around a tress of hair—itself wrapped upon a mandrel—and the chemical reaction of the water and the contents of the envelope gave out the heat. The invention spoke to an art which had been familiar with permanent hair waving for more than twenty-five years. In 1905, one, Nessler, produced a machine by which a tress, wetted with a soda or borax solution, was wound upon a mandrel and heated by electricity. He patented this in 1910, but it was expensive, laborious, and trying upon the customer. Between 1910 and 1920 it was improved by Suter and Frederics, and nine-tenths of permanent hair waving is still done in this way. The first chemical waver was devised by Sartory, who filed his application in August, 1924, and got a patent (No. 1,565,509) on December 15, 1925. He specified "calcium oxide, strontia, baryta or other suitable material or materials with

water" (page 1, lines 19, 20), to be put up in pads, which were to be wrapped around a mandrel bearing the tress, and covered by a metal tube carrying an injector by which water could be squirted upon the chemical. Many of the disadvantages of the electric curler remained; each tress required a separate tube, and as each would stay hot beyond the end of the time necessary to wave the hair, if neglected they would overcook the hair, and it was difficult to make them operate evenly. An American company was organized in 1925 to exploit this patent, but it was unsuccessful and went bankrupt in 1928, when Evans bought the patent, and unsuccessfully tried to use it until he made his own invention. Some time in 1931—the exact date does not appear—one, Poyner, showed him a pad like Sartory's, but designed to be used without any enclosing tube or machine; it was to be merely wrapped around the tress, as usual rolled upon a mandrel. Shortly after that, one, Barnett, and his wife, showed him another pad of the same sort; and in a letter of December 30, 1931, he acknowledged the Barnetts as "the inventors of a process for permanently waving hair without the use of a machine, or electricity"; and engaged them to apply for patents which should be assigned to him, and whose validity they were to warrant; Poyner being "nullified," if possible.

Evans must have been experimenting with such pads before this letter, for his application was filed on January 21, 1932; but as he learned of Poyner and Barnett during 1931, his period of probation was less than twelve months. He testified—and there is no reason to question it—that in practice Barnett's pad had several disadvantages; the immediate reäction, when for instance calcium oxide—quick-lime—was used, was so swift that the operator would burn her fingers before she could wrap and secure the pad; if the reäction were delayed to prevent this, the "delayer" would unduly hold it back thereafter, at a time when it should be speeded up; finally, the temperature would not keep up for the necessary six or seven minutes, for the heat would go off too fast. The optimum waving pad would have none of these defects. The patented invention is the result of Evans' efforts to make one; the specifications disclosed it as follows. It was said to relate to that kind of permanent waving in which the tress was subjected to the heating action of a chemical "such as calcium oxide," and it was concerned with "controlling the development of the heat * * * wherein certain materials are used to delay * * * *or* to accelerate the development of the heat, *or* to extend the development of the heat over a longer period of time than could be done by the self-heating chemical itself, said materials being used *also* for delaying *and* then accelerating * * * or for delaying, *then* accelerating *and finally* extending the heat development."[1] (Page 1, lines 10–23.) The "delayer" might be "an inert powder such as starch" (lines 36, 37), which acts "probably by preventing the rapid wetting of the heating chemical" (lines 46, 47). Or it might be "certain salts, such as ammonium sulphate" (lines 51, 52); or "sugar" (lines 53–59); or "a basic substance such as ammonium hydroxide" (lines 61–62); or "a dry base such for instance as sodium hydroxide" (lines 63–65). The "accelerator" might be "an acidic material" like "aluminum sulphate" (lines 70–75); the "extender," "a diluent, such as sand," or "a substance which would emit a volatile gas," thereby "removing the heat and keeping the temperature down"; an "ammonia compound" would serve for this (lines 81–87). No proportions are given. Next follow two details not here involved, and an option to use the chemical in friable form, or in a cake made with glycerine. This constitutes the whole of the disclosure except a description of the pad and the method of its application, which do not concern us. Of the ten claims in suit number twenty-eight will serve as a type; it is as follows: "28. Means for waving hair including a chemical which, when moistened, will generate sufficient heat to impart a permanent wave to the hair, and means combined with said heating chemical for delaying and then accelerating the natural development of the heat without raising its temperature and finally extending the development of the heat over a considerable period of time."

The "delayer" supposedly used by the defendant is "aluminum oxide," "a basic substance"; such substances had been known to delay the reäction of calcium oxide. The defendant's "accelerator" is alleged to be one-third of the copper sulphate, its heating agent; it was also known

---

[1] We have added the emphasis.

that acids accelerated the reaction of calcium oxide. The defendant's "extender" is feldspar; it is a diluent like sand and corresponds to that part of the disclosure, not to the volatile gas which was to remove the heat. Such diluents were used in Ziegler (No. 1,910,874) "to give bulk to the mixture" (page 1, line 97) in a pack which "must be capable of giving off quantities of heat over a considerable period of time" (page 1, lines 19–21). Berkey (No. 1,497,970) also added to his chemical heater "sand * * * or any inert material in order to give body to the compound" (page 2, lines 24–31); Kirk (No. 1,729,044) did the same; and sawdust and other silicates had been common. It is true that these references do not expressly declare that the sand was added to extend the heating period; but they did extend it, and in Ziegler's pack at any rate the heat had to be kept going "for a considerable period." Moreover, the plaintiff does not argue that the substances specified by Evans to "delay," "accelerate" and "extend" the reaction of the heating agent were not known; it concedes that they were, and so the judge found. It bases its case upon the fact that they had never before been used in a combination for regulating the action of a hair-waving pad, or for waving hair at all. The uses had been "non-analogous," as the judge also found. It says that the art for over a quarter of a century had needed an effective chemical waving pad; and yet, though every element had been known—all the tools so to speak had been at hand—not until Evans had the insight to combine them, had satisfaction come. The result was immediate success.

This reasoning disregards the facts. Evans did not invent the curling pad; Sartory did. After Sartory came Poyner and the Barnetts, who took it out of the machine with its separate tubes and injectors, and used a wet sheet or slab instead. At most Evans could claim to be no more than an improver over these, upon whose shoulders he stands. Let us assume that he eliminated the defects of their work by establishing "controls." That might require invention for several reasons. It might be hard to find out why the pads did not do their work properly; it might be hard—after one had found that out—to learn what reagents would correct their shortcomings; finally, it might be hard—after one had learned what reagents to use— to discover the right way to use them. As to the first, however, there was no possible difficulty; the pads must not burn the operator's fingers before she could put them on; they must not be slow after she had done so; they must last long enough to give a permanent wave. These defects either appeared to Evans during his experiments, or were absolutely sure to appear when the pads began to be used. Their absence was merely the definition of an optimum pad, as everyone wanted it; no invention could lie in its conception, as such. Next, it might indeed have taken ingenuity to discover the proper reagents to correct these defects after they were discovered; but it did not. All those selected, had been used for similar, though not identical, purposes. Any chemist desiring to delay the reaction of "calcium oxide" or the like in such a pad would certainly turn to the reagent which had so performed upon the same substances when used in other heating apparatus. Certainly, it was no act of creative imagination to pick out that substance for the same work in a pad, which it had done in a pack. That is all that Evans disclosed; he merely set out what the pad should do and what reagents would produce each of the needed reactions. It is quite possible that in making the pads in practice a good deal more was, and is, required. Apparently the substances available vary in quality and even the same substance is not uniform in its results. Their blending so that they may act in proper sequence, may demand much ingenuity; we need not question Evans's skill in all this. The composition of his pad has changed more than once, and the substitutions have been improvements; certainly, the large sales waited upon them. But the specifications and the claims say nothing about blending or composition beyond enumerating what elements shall be used and what they will do; and these were all preördained for any competent chemist who wished to make the optimum pad. If more was required, he was left to his own devices; if the compounding of them, their proportions and their quantity, was plain, Evans's solicitors were well advised not to claim the method; if it was not plain, the specifications are inadequate, and the patent is invalid for that reason.

It is quite idle to appeal to the plaintiff's success, or the delay of the art to produce the pad. Poyner or the Barnetts may have made a real invention; Sartory's pad had limped along for over six years,

**938**

during all of which a pad without tube and injector would probably have been as welcome.as it was later. But we cannot attribute that success to Evans as against Poyner or the Barnetts; rather the opposite, because, although the Barnett pad may have been impractical as it was, without it Evans's pad could never have even come into existence. It is not as though a substantial time had passed after the pad came out before he improved it; the art did not have to wait for it at all; and the interval is not a breath in support of the conjecture that his changes were beyond the powers of any competent chemist.

It is not necessary to say anything about the other patents, for they are merely examples of the original.

Decree reversed; bill dismissed for invalidity of the claims in suit.