50 CCPA
## Application of Sidney DILNOT.
### Patent Appeal No. 6938.

United States Court of Customs and Patent Appeals.
June 28, 1963.

Lewis D. Konigsford, Chicago, Ill. (Max Wall, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of

counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals which rejected claims 1, 11–13, 16, 18, 19, 21 and 22 of appellant's application [1] entitled "Calcium Silicate Hydrate Products" as unpatentable over the prior art.

The initial decision of the board affirmed the examiner's rejection of claim 22, presented for the purpose of interference, but reversed the rejection of the remaining claims on the art relied on by the examiner. The board also rejected those claims on two new grounds, one of which involved reliance on a newly cited reference, under the provisions of Rule 196(b). That decision was adhered to on reconsideration. Six method claims are allowed.

The invention relates to light weight construction material, particularly to a calcium silicate hydrate product characterized by a combination of desirable properties, such as low apparent density, high strength and low "moisture movement," [2] which are not shown in the prior art. The advantageous combination of properties is said to be effected "by carrying out the formation of the calcium silicate hydrate in such a way that it consists of a matrix or web of aerated calcium silicate hydrate surrounding and adhering to the particles of a dispersed light weight porous aggregate."

The prior art is acknowledged by appellant to teach the following:

Calcium silicate hydrate products, with which the present invention is concerned, are formed conventionally by mixing ground inorganic calcareous substances, which furnish lime or its equivalent as a reactant, and ground inorganic siliceous substances, which furnish silica or its equivalent as a reactant, with water and allowing the mixture to harden under conditions favoring the formation of calcium silicate hydrate. * * * The indurating or hardening step is usually carried out, especially after an initial hardening or presetting period, at an elevated temperature and in the presence of an excess of water, generally in the form of saturated steam. A conventional procedure involves heating the preset forms under a pressure of 140 to 150 pounds per square inch of saturated steam. These products are distinguished from ordinary cement products or concrete, because of the elevated temperature employed during the hardening step, by the development of a crystalline calcium silicate hydrate, rather than by the calcium silicate hydrate gel which is formed in the setting or hardening of ordinary cement products or concrete.

* * * * * *

The production of light weight calcium silicate hydrate products has heretofore been accomplished frequently by incorporating bubbles of air or other gases, usually as a preformed foam, in a mixture of calcareous and siliceous components and water, and then hardening the mixture to form a product, a considerable proportion of the volume of which consists of non-communicating voids corresponding to the gas bubbles incorporated in the wet mixture. Such products may be referred to as "aerated calcium silicate hydrate products". * * *

The method employed by appellant to prepare his calcium silicate hydrate products consists of mixing the several in-

1. Serial No. 409,792, filed February 12, 1954.

2. "Moisture movement" is described by appellant as a characteristic of many con-

crete or cement products, it being the characteristic of undergoing a relatively high degree of expansion and contraction on wetting and drying.

gredients which include (1) a calcareous substance,[3] (2) a silicious substance,[4] (3) porous light weight aggregate,[5] and (4) a preformed foam[6] to form a slurry which is cast into molds and hardened. The preferred hardening or induration step consists of heating the article in an atmosphere of saturated steam at a pressure from 100 to 200 p. s. i., for several hours.

Claims 1, 16, and 22 are representative and read:

"1. In a method for making an indurated, light weight calcium silicate hydrate product, the steps which include: providing a body of a slurry comprising a calcareous component, a siliceous component and water, the amount of water being proportioned to provide a stable slurry; injecting a predetermined volume of a preformed foam under pressure beneath the surface of said body; and agitating the mixture of foam and slurry to distribute the foam substantially evenly throughout the body.

"16. An article comprising from about 0.75 to about 1.75 parts by weight of a porous light weight aggregate having an apparent density of from about 35 to about 65 pounds per cubic foot surrounded by and bonded to about one part of a rigid calcium silicate hydrate matrix, the matrix containing a plurality of small, substantially non-communicating spherical voids and the product being further characterized by a dry bulk density of from about 40 to 45 pounds per cubic foot, a compressive strength when dry of from about 900 to about 1800 pounds per square inch and a moisture movement of from about 0.02 to about 0.05 per cent, said article being produced by indurating in superatmospheric pressure steam an aerated slurry of calcareous and siliceous components and aggregate.

"22. The method of producing a cellular cementitious structure consisting of the steps of, preparing a slurry of cementitious material, generating a stable air foam, continuously introducing said foam into said slurry, and intimately mixing said foam with said slurry as said foam is introduced to produce a substantially uniform dispersion of said foam in said slurry, introducing said mixed foam and slurry into a form of desired configuration, and allowing said mixture to set and harden."

The references relied on are:

| Greider | 1,782,384 | November 18, 1930 |
| Albert | 2,243,369 | May 27, 1941 |
| Jahjah | 2,282,190 | May 5, 1942 |
| Selden | 2,540,354 | February 6, 1951 |
| Dixon et al. | 2,864,714 | December 16, 1958 |
| | | (Filed Feb. 9, 1954) |

The board rejected all the claims on appeal as unpatentable over Dixon et al., and also as unpatentable over Jahjah, with reliance on Selden and Albert for the disclosure of limitations found in certain claims.

Jahjah discloses a process for producing cast multicellular concrete blocks and slabs in which the concrete, while in the wet state, is combined with an "aerated foam" creating a product having "an

3. A calcareous substance is defined by the specification as an inorganic substance which contains or will furnish lime during the induration step for the formation of calcium silicate hydrate. For example, quick lime, slaked lime and Portland or hydraulic cement.

4. A silicious substance is defined by the specification as an inorganic substance which contains or will furnish during the induration step silica for the formation of calcium silicate hydrate. For example, diatomaceous earth, sand, silica flour and slag.

5. The term "porous light weight aggregate" is defined as an inorganic material having an apparent density in the uncrushed dry state of 35-65 pounds per cubic foot. For example, pumice, clinker, expanded shale or clay, and vermiculite.

6. Preformed foam is defined as "an aqueous foam, such as used conventionally in the cement and allied arts." It is prepared by forming a dilute, e. g. a 1 to 4% aqueous solution of a conventional foaming agent and then incorporating bubbles of air in it in "any convenient manner."

infinite number of uniformly distributed bubbles or cells." The foam is said to have properties which cause it to persist "even when subjected to agitation in the presence of cement and aggregates as in a concrete mixer." Jahjah makes his concrete products by first preparing a stiff aqueous foam containing animal glue, ammonia alum, caustic soda, colophene and aluminum powder. The patentee states:

"Thereupon, the foam is measured into a mixer into which is introduced the requisite amount of cement and water, with or without aggregates, to make a mixture for pouring into molds or forms. The mixer introduces the foam into the mixture of cement and water, and these materials spread over and through the foam and seal the gaseous bubbles within the body of the product. After the foam is thoroughly mixed into the mixture of cement, sand and water, the product is poured into molds or forms to set. * * *"

Dixon et al., the second basic reference relied on by the board, is directed to the manufacture of light weight concrete. The method described by the patentee consists of preparing a cementitious slurry and mixing therewith a continuously generated air foam. Production of the foam is described as follows:

"The requisite foam is produced by intimate admixture of air with a premixed solution of a suitable foam-forming liquid, which air and liquid are both delivered to a mixing head under suitable pressure and from which they issue for conjoint traverse through a myriad of tortuous paths which insure most intimate mingling of the foam-forming liquid and air to produce foam having such substantial expansion (gallons of foam produced per gallon of foam-forming solution) as to form extraordinarily stable foam bubbles of exceedingly small diameter.

"The premixed foam-forming liquid preferably is of the type produced by alkaline hydrolysis of animal proteinaceous material, of which a hydrolysate is prepared by suitable admixture of caustic soda and lime acting as a hydrolyzing agent. A hydrolysate satisfactory for the production of foam to be incorporated in a concrete slurry may be prepared in accordance with the following procedure, it being understood that the present invention is not intended to be limited to the use of any particular proteinaceous foam-producing liquid."

The Albert patent is directed to cementitious products made from a slurry of pumice or Kieselgur, reactive silica, lime and water. Such a mixture is taught to yield silicate of lime upon steaming at up to 180°C under pressure. The patentee states:

" * * * As silicate of lime has a relatively high specific weight, the small weight per volume unit for the intermediary cementing substance can be obtained only by imparting to it a porous structure. By this the intermediary cement will be in its final dry state honeycombed with air cells. The finer and more uniform these air cells, the better is the strength of the stone.

"Two methods have been followed to produce these air cells. According to the first, gas bubbles are generated in the mortar before its setting. This required the addition of undesirable chemicals. According to another method gas, especially air, has been whipped into the mortar, to impede the settling. In both cases the dispersion of the gases in the mortar was insufficiently fine and uniform, hence, the strength of the stones was low. * * *"

Selden discloses the preparation of molded cementitious articles by pouring a slurry of lime, silica and water into a mold. The mixture is preliminarily integrated or set with steam at atmospheric pressure followed by induration at superatmospheric pressure.

We shall not discuss the Greider patent since it was not relied on by the board.

The board rejected the claims as follows:

"Claims 1, 11, 12, 13, 16, 18, 19 and 21 are not patentable over Jahjah, who incorporates a preformed foam into a slurry of cementitious components with or without aggregates to produce a lightweight multicellular cementitious mixture not patentably distinguishable from the article claimed by appellant (claims 11, 12, 13 and 16). The density of the Jahjah composition can be varied as desired. The choice of known lightweight aggregates in the cementitious mixture is well within the expected skill of one having ordinary skill in this art.

"The autoclaving of cementitious products to produce hard, set compositions is quite apparently conventional in this art as indicated in this record by the Selden, Albert, Dixon et al. patents.

\* \* \* \* \* \*

"All the appealed claims, 1, 11, 12, 13, 16, 18, 19, 21 and 22, are unpatentable over Dixon et al., who teach the preparation of cementitious materials, of the same properties as those claimed, by a process differing, if at all, in minor expedients known to art. Autoclave heating of the mix is taught (column 2, line 14) as is the introduction of the foam into cementitious materials optionally containing any known aggregate. The preformed foam is continuously incorporated into a cementitious slurry."

As to method claims 1, 18, 19 and 21, appellant contends that there is no anticipatory disclosure in Jahjah or Dixon et al. in that both references fail to describe pressure injection of preformed foam into the cementitious slurry beneath its surface. He points to the fact that Jahjah contemplates only mixing the foam and slurry in a concrete mixer which, because of its construction and mode of operation, would make it impossible to inject the foam under the surface of the slurry.

The board dismissed the limitation with respect to injection of the foam beneath the surface with the statement that it was no different from Jahjah, since the distance beneath the surface for the introduction of the foam is not specified, and noted on reconsideration that Jahjah introduced the foam in such manner as to cause the cementitious mixture to spread over the foam. Thus, they held the reference to read on appellant's claims, particularly since the claims failed to recite the pressure under which the foam is introduced. The board found the variation between the methods employed by appellant to introduce the foam and that employed by Jahjah to be within the skill of the art.

We agree with appellant that conventional concrete mixers, the only mixers disclosed by Jahjah, consist of an open ended drum rotating on a horizontal or inclined axis; the drum having blades or vanes fixed on its interior wall. Hence, the foam would have to be introduced through the open end, and could not be injected under the surface of the slurry as required by the claims. Under those circumstances we do not find any teaching in Jahjah that foam could or should be introduced either under pressure or under the surface of the slurry.

The Dixon et al. patent does not disclose the manner in which the foam is introduced into the slurry, it being primarily concerned with apparatus for obtaining a suitable foam. Thus Dixon et al. also fail to disclose the concept of pressure injecting foam beneath the surface of a concrete slurry. Neither Jahjah nor Dixon et al. discloses appellant's concept of adding the preformed foam under pressure beneath the surface of the slurry, nor any apparatus capable of producing such a result. Additionally, we find nothing elsewhere in the record to suggest such a step. Hence, we do not find the invention claimed in claims 1, 18, 19 and 21 to be obvious over the prior art of record, and reverse the board as to those claims.

Claims 11, 12 and 13 are drawn to the article produced by the method of claim

2 which was allowed by the examiner. That claim recites the step of "injecting the preformed foam under pressure beneath the surface" of the cementitious slurry. Although the board noted that appellant has not demonstrated that his method of adding foam produced products differing from those of Jahjah, or Dixon et al., it seems to us that the improved physical properties of appellant's products are, at least in some measure, attributable to the mode of introducing the foam. We are of the opinion, therefore, that since the step mentioned above would not be obvious to one skilled in the art, the articles produced thereby would be unobvious for the same reasons as the method. Hence, we are obliged to reverse the board's decision as to those claims.

Appellant urges the patentability of claim 16 on the grounds that the combination of properties recited therein is new, and additionally, that the prior art fails to disclose the use of "light weight aggregate" in the cementitious composition claimed. We do not agree with those contentions.

Jahjah discloses preformed foam mixed into a slurry of calcareous and silicious components which, as the art well recognizes, will upon setting produce a calcium silicate hydrate matrix [7] having uniformly distributed air cells. The composition may optionally contain aggregates. Appellant himself concedes that "light weight aggregates have been used in conventional concrete technology" and such fact is shown by Albert who teaches that materials of the lowest possible density such as pumice should be used in order to produce highly porous moulded calcium silicate products. Hence, we agree with the board that it would be obvious for one skilled in this art to use a highly porous aggregate such as taught by Albert in the composition of Jahjah. We

note that claim 16 is not limited to any particular mode of mixing the ingredients, and in particular does not require that the foam be introduced in any particular manner. Moreover, appellant's application states, "the preformed foam can be incorporated in the slurry in any convenient way." Thus, claim 16 reads on a product which may have foam incorporated as taught by Jahjah. Under such circumstances, we find the subject matter of claim 16 to be obvious over Jahjah in view of Albert. The rejection of claim 16 is affirmed.

Claim 22 was rejected by the examiner as unpatentable over Greider or Jahjah on the ground that each patent discloses the steps of preparing a slurry of a cementitious material, separately generating a stable foam, mixing the foam with the slurry and then molding the mixture. The board affirmed that rejection, relying however, only on Jahjah, while holding Greider to be cumulative. It stated:

" * * * Jahjah combines the preformed foam into various cement and concrete mixtures wherein known aggregates may optionally be incorporated. The foam is introduced from a reservoir into a concrete mixer containing the cement mix, and, in our opinion, it would be obvious to a technician having ordinary skill in this art to add the foam gradually to the cement mix while it was being mixed, since, as pointed out by the Examiner, conventional cement mixers operate in this fashion. Further, Jahjah obtains uniform dispersion of the foam and produces a multicellular cementitious product not differentiated in this record from that obtained by appellant. * * * "

Claim 22 contains no limitation with respect to pressure injection of foam beneath the surface of the slurry, rather it

---

7. Note, for example, the teaching of the Albert reference which states:
   " * * * With pumice stone or kieselgur, presenting more or less reactive silica, lime will be the most suitable binding agent which yields silicate of lime by steaming under pressure in presence of water. As silicate of lime has a relatively high specific weight, the small weight per volume unit for the intermediary cementing substance can be obtained only by imparting to it a porous structure. * * * "

is drawn to a method whose essential steps include (1) preparing a cementitious slurry, (2) generating a stable air foam, (3) continuously introducing said foam into said slurry, and (4) introducing the mixture into a form, wherein it is allowed to set and harden. Appellant contends that claim 22 distinguishes patentably over Jahjah in requiring the addition of the foam to be continuous.

Upon reconsideration, the board answered that contention as follows:

" * * * Although appellant urges claim 22 to be drawn to a continuous process, the limitation 'continuously introducing said foam' relates to foam introduction, the remainder of the claimed process apparently reading on a batch process. As to the quoted term in the claim, we find no patentable distinction over the Jahjah mode of delivering a measured volume of foam into a concrete mixer containing a slurry of cementitious material and distributing the foam into the mix. Quite apparently, the foam is not introduced all at once into the mixture but must be gradually and hence, continuously, introduced into the mixture until all of the foam has been incorporated.

"Appellant apparently relies upon continuous operation to differentiate over the Jahjah batch process. It is, however, well within the expected skill of the technician to operate a process continuously. In re Lincoln, 126 F.2d 477, 29 CCPA 942; 1942 C.D. 386; 541 O.G. 668; Dow Chemical Co. v. Coe, 1942 C.D. 128; 545 O.G. 905; 132 F.2d 577; In re Korpi et al., 160 F.2d 564; 34 CCPA 956; 1947 C.D. 290; 602 O.G. 672."

We have reviewed the pertinent portions of Jahjah and find the board's rejection of claim 22 to be fully justified for the reasons given by them. We therefore affirm the rejection of that claim. Under these circumstances, it becomes unnecessary for us to consider the board's rejection of claim 22 under Rule 196(b) over Dixon et al.

For the reasons given we reverse the rejection of claims 1, 11, 12, 13, 18, 19 and 21, and affirm the rejection of claims 16 and 22.

Modified.