BORDEN, INC., Plaintiff,

v.

OCCIDENTAL PETROLEUM CORPORA-
TION and Occidental Chemical
Company, Defendants.

Civ. A. No. 70-H-149.

United States District Court,
S. D. Texas,
Houston Division.

June 19, 1974.

Bill Durkee, Arnold, White & Durkee, Houston, Tex., Stanton T. Lawrence, Jr., Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff.

Jefferson D. Giller, Fulbright & Crooker, Houston, Tex., Andrew J. Belansky, Christie, Parker & Hale, Pasadena, Cal., for defendants.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

This is a highly complex patent infringement suit involving what is alleged by plaintiff to be a "specifically claimed method of defluorinating phosphate rock" which is a "significant improvement of an earlier commercial process". The products of both processes are used as phosphatic fertilizers and animal feed supplements.

Plaintiff Borden, Inc., (hereinafter referred to as "Borden") is the owner of United States Patent 2,995,437 [Hollingsworth, filed 1959, granted 1961] (hereinafter referred to as the '437 patent) which was obtained by its inventor, and Borden's principal trial witness, Clinton A. Hollingsworth. The plaintiff complains of infringement by defendant Occidental Petroleum Corporation and its wholly owned subsidiary/division Occidental Chemical Company (both of which are collectively referred to hereinafter as "Occidental").

The Complaint, filed in 1969, has two counts, one alleging that the operation of defendant's plant at Galena Park, near Houston, Texas, has infringed the '437 patent. The other count alleges that the operation of a plant of defendant then under construction (and since operational) at White Springs, Florida, would infringe the same patent.

Defendant Occidental alleges noninfringement and also contends that the '437 patent is invalid on each of the following separate grounds:

(1) The patented subject matter was described in printed publications, both before the date of the purported invention and more than one year before the application was filed, contrary to 35 U.S.C. §§ 102(a) and (b);

(2) The patented subject matter was known and used by others in this country before the date of the purported invention, contrary to 35 U.S.C. § 102(a);

(3) Products made by the patented process were sold by Borden more than one year prior to the filing of the '437 application on April 23, 1959, contrary to 35 U.S.C. § 102(b);

(4) The applicant did not himself invent the subject matter which was patented, contrary to 35 U.S.C. § 102(f);

(5) The patented subject matter was described in patents granted on applications filed by others in this country before the date of the purported invention, contrary to 35 U.S.C. § 102(e);

(6) The subject matter sought to be patented was obvious at the time the purported invention was made, contrary to 35 U.S.C. § 103;

(7) The claims fail to particularly point out and distinctly claim the purported invention, contrary to 35 U.S.C. § 112; and

(8) The applicant was guilty of unclean hands and practiced fraud on the U.S. Patent Office in its procurement.

As the following Findings of Fact and Conclusions of Law indicate, it is the opinion of this Court that the '437 patent of Borden is invalid and that as a consequence there has been no infringement of that patent by Occidental.

## FINDINGS OF FACT

### General Background

1. Borden is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New York City, New York, and is the owner of the '437 pat-

ent with the right to sue for and obtain injunctive relief and damages for past infringement, if appropriate.

Borden has been involved in the industry of defluorinating phosphate rock for fertilizers and animal feed supplements (hereinafter referred to as the defluor industry) since 1964 when it acquired the Smith-Douglass Company, Inc. (hereinafter referred to as "Smith-Douglass), a Virginia corporation, which operated facilities at Lakeland, Florida. Smith-Douglass entered the defluor industry in 1952 when it acquired Coronet Phosphate Company (hereinafter referred to as "Coronet"), a New York corporation, which also operated the Lakeland facilities.

2. Occidental is a corporation organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California. Occidental Chemical Company is a division of Occidental Petroleum Corporation with its principal place of business in Houston, Texas.

Occidental has two facilities pertinent to this case which were or are involved in the defluor industry. One is located in Galena Park, near Houston, Texas. This facility began operations in the early 1950's as Butler Chemical Company ("Butler"), which merged into Hooker Chemical Corporation ("Hooker") in 1959, and was acquired by Occidental in 1968. This facility was shut down in 1970. Occidental's other facility was constructed at White Springs, Florida, and began operations in 1970.

3. The names of two other companies involved in the defluor industry appear in this litigation. One is International Minerals & Chemical Corporation ("IMC") which began operations in the 1930's and ultimately had several plants in operation. Of concern here are a plant located at Wales, Tennessee, which shut down operations in 1965, and an experimental station located at Mulberry, Florida. The other company is Rocky Mountain Phosphate which was formed in 1959 and was subsequently licensed by plaintiff Borden in 1967 to operate under the '437 patent.

4. Phosphate rock is a naturally-occurring complex substance of which phosphorus, sodium, silica and calcium are the most significant elements insofar as this litigation is concerned. The calcium and phosphorus are valuable in plant food, fertilizers and mineral supplements for livestock and poultry feeds. If properly processed, they may be converted to biological forms which may be easily assimilated. Phosphate rock in its natural state contains approximately 4% fluoride by weight which is toxic to animals, although not to plants.

Some of the minor constituents found in phosphate rock include magnesium, iron and aluminum. In some phosphate rocks, such as those generally located in Tennessee, these minor elements are contained in substantially greater amounts than are found in other phosphate rock sources, such as those in Florida.

5. Throughout this opinion, the various constituents are referred to by their chemical abbreviations. Phosphorus, the chemical symbol for which is "P", is generally referred to as $P_2O_5$, the molecular chemical formula for phosphorus pentoxide. The term is generally used in the fertilizer industry to denote the phosphorus content of a material or product. Sodium, the chemical symbol for which is "Na", is generally referred to as $Na_2O$, the molecular chemical formula for sodium oxide. Calcium, the chemical symbol for which is "Ca", is generally referred to by its molecular chemical formula as $CaO$ or calcium oxide, more commonly known as lime. Silica commonly appears as silicon dioxide, the molecular chemical formula of which is $SiO_2$. Magnesium appears as $MgO$, iron as $Fe_2O_3$, and aluminum as $Al_2O_3$.

The above molecular chemical formulas refer to the weight of a molecule of the particular particle, the weight being the sum of the weights of the constituent atoms of the elements involved. This opinion refers to various molecular ratios ("mol ratios") and mol ratio for-

mulas used by various parties in the defluor industry over the years. Mol ratios generally pertain to the molecular weight composition of the final fertilizer or feed supplement product and are used as a means for checking the effectiveness of the defluor processes.

6. One of the principal processes of the defluor industry involves the calcination of the natural rock. Calcination is a process for heating materials to a high temperature, but without substantial fusing or melting of the mixture. Temperatures involved in calcination processes generally were in the 2000–2700°F range.

A principal purpose of calcination is to remove the toxic fluorine from products to be used for animal feed supplements. This is often referred to as defluorination. The defluor industry has established the specification that feed supplements will contain less than 1% fluorine compared to the weight of the phosphorus in the final product; this is commonly expressed as having a phosphorus to fluorine weight ratio greater than 100, or a "P/F greater than 100".

7. Calcination also causes chemical reactions to occur between the components of phosphate rock and the various additives with which it may be mixed prior to being fed into the calcination vessel.

Over the years the feed mixture, often called the feed charge, has included silica, water, phosphoric acid ("H3PO4", commonly identified hereinafter as "P2O5" because of its role in increasing the phosphorus content of the final product), and a soda compound such as sodium hydroxide ("NaOH"), or sodium carbonate ("Na2CO3"). The role of these additives to this litigation is explained in certain of the findings set forth hereafter.

8. Over the years calcination has occurred in various types of equipment. During the 1940's and into the late 1960's, the most common equipment involved rotary kilns. The kiln is a large steel tube several feet in diameter; some described in the record are 8 feet in diameter and 180 feet long. Others are much smaller. The kilns are lined with a refractory brick approximately six inches thick which can withstand the high temperatures involved. The kiln is supported on tires or riding rings so as to allow a rotation speed of several revolutions per minute. Some were operated at 3–4 rpm, although the speed could be varied. The kilns are mounted with one end higher than the other, and in some the mounting angle apparently could be varied. At the lower end is located a burner, whose flame provides the heat for the high temperature needed for proper calcination and defluorination. Originally coal was used as a fuel in burners. Due to adverse chemical reactions of the coal with the feed mixture, the fuel was changed in most cases to fuel oil or natural gas. The feed charge enters the kiln at the raised end. The angle and rotation causes it to move slowly toward the burner; as the feed charge picks up heat, the various chemical reactions occur. As the mixture approaches the lower or heated end of the kiln, it is removed while it is still red hot; the mixture is then generally quenched with water to cool it down. This defluorinated product is then suitable for use.

More recently, the trend has been towards using what are known as "fluid bed reactors". For purposes of this litigation it is not necessary to describe these reactors other than to note that they accomplish the same results as the rotary kiln while allowing substantially greater control over the temperatures and reactions involved.

9. Feed preparation plays a highly important role in the defluor industry. Phosphate rock in its natural state is mixed with sand, clay and organic material from which it must be separated prior to calcination. The natural phosphorus content of the rock is measured by reference to bone phosphate of lime ("BPL"). The higher the percentage BPL or phosphorus content, generally the lower the amount of impurities, of

which SiO2 is the most important. It should be noted that historically fertilizer processes sought to use the highest BPL rocks available as their phosphorus content was more readily, and hence more inexpensively, converted into commercial products. Over the years as the better quality rocks became less readily available, lower grade rocks were used and beneficiation, described below, was increasingly used to upgrade commercial products. Thus, economics and BPL availability dictated the extent of use of lower quality rock.

It appears from the record that the natural phosphate rock mixture as mined from the ground contains about 30–35% BPL by weight, about 30–35% SiO2, with the remaining weight being clay and other organic material. As will be noted hereafter, the preferred rock for calcination is in the 72–77% BPL range with an SiO2 content of 2–6%.

In order to upgrade the phosphate rock mixture as mined, it is flushed with water to form a "slurry" which is pumped through a process called beneficiation. The first stage involves a washer which first screens out various sizes, including a low grade particle called pebble phosphate, then subjects the slurry to mechanical agitation which causes some of the clays to fall out. The mixture then goes through a phosphate (or "rough") float followed by an amine (or "reverse floatation") float. The first float utilizes a reagent which adheres to the phosphate concentration, causing it to float to the surface, leaving most of the impurities behind. This upgrades the phosphate concentration to between 60 and 70% BPL. This concentration is mechanically scraped off the surface and goes to the amine float where the reagents adhere to the SiO2, causing it to float up and away from the remaining phosphate particles.

During the beneficiation process, the primary concern is the amount of remaining SiO2; the final product may vary from about 72 to 80% BPL. By controlling the reagents and "pulling"

harder, the SiO2 content may be reduced; the lower the content desired, the more expensive the operation due to the cost of reagents. As an example, the stringent requirements demanded by plaintiff for its '437 process reportedly results in only about 5% of all the phosphate rock mined and beneficiated being suitable for that process.

10. Over the years, the fertilizer and animal feed supplement trade has set certain specifications for products. One is the P/F greater than 100 rating for fluorine content noted earlier. Another is the degree with which feed supplements may be assimilated by animals. "Biological availability", or "availability" as it is commonly called, is a term which relates to the relative performance of a phosphate feed supplement when compared to a recognized standard applied in laboratory feeding experiments using live animals. The availability of the various products over the years appears to have varied from 80 to over 90% and was a major concern of most producers.

Another specification, which is of particular concern to this litigation, is the percent of phosphorus content by weight in the final product, expressed as "% P". Natural ground bone meal, the original standard against which products were measured, contains about 13–14% P. Calcination of natural phosphate rock, without more, will produce a product of 10% P or less. During the early 1940's, when bone meal was being used in the war effort, Coronet was able to market successfully an 8.5% P product utilizing a "high-silica" process. During the late 1940's, specifications rose to include 14.5 and 16% P products. Beginning in the early 1950's, both 17 and 18% P products were marketed. Borden began selling a 17% P product, while IMC and Butler produced 18% P products. Subsequently, the 18% P product became the primary standard which remains today, although current products on the market do range from below 10% P to 20% P.

*Calcining Processes and Constituents*

11. Before relating the proof as to the various calcination processes used in the defluor industry over the years in order to indicate the state of the art, the problems, and the developments, it is important to set forth the respective roles played by certain of the key constituent elements.

*Calcium:*

12. Calcium or CaO is a major constituent of phosphate rock, reportedly varying between approximately 42–55% by weight of the mixture following beneficiation. Its role in calcining processes in general, and the '437 process in particular, is basically uncontrolled, as there is no attempt to adjust its relationship to the $P_2O_5$ in the rock.

*Sodium:*

13. Sodium or $Na_2O$ in the calcining process aids in converting the $P_2O_5$ of the rock to a more biologically available form. The prior art teaches the addition of $Na_2O$ in one or more of its various forms. For example, Patent No. 601,089 (Wiborgh, filed 1896, granted 1898) described in very general terms the addition of sodium carbonate, $Na_2CO_3$. Patent No. 2,337,498 (Ritter, Rodis, Weitendorf, applied 1939, granted 1943) [hereinafter referred to as the Ritter patent] states that "it has, for a long time, been known to decompose the raw phosphates with the aid of sulphuric acid". The Ritter patent notes the ratio of 0.5 $Na_2O$ for every mol of $P_2O_5$ in the rock. There is similar teaching in a 1924 article, Guernsey and Yee, "The Preparation and Chemical Nature of Calcined Phosphate". *Industrial and Engineering Chemistry*, Vol. 16, p. 228. The article notes that the optimum conversion of the rock $P_2O_5$ occurs when the ratio of $Na_2O$ to the $P_2O_5$ in the rock is 0.5.

It should be noted that the '437 patent requires maintenance of from 0.3 to 0.7 mols $Na_2O$ to the $P_2O_5$ in the rock, thus spanning the 0.5 figure for maximum

conversion taught in the prior art. As plaintiff notes, Guernsey and Yee do not disclose processes for the purpose of defluorinating. Nevertheless, one of the key concerns of the defluor industry over the years was the availability of phosphate products, a subject towards which Guernsey and Yee specifically directed their article.

*Silica:*

14. The role of silica, $SiO_2$, is of critical importance in this litigation. The record, including prior art, reveals that the presence of silica accelerated the elimination of fluorine in the defluorination of phosphate rock while simultaneously contributing to the lowering of the fusion temperature of the mixture. By keeping the silica content low in feed mixtures, higher temperatures could be utilized, thus permitting better operations and defluorination without fusion. Over the years the various calcination processes sought to strike a satisfactory balance as to the amount of $SiO_2$.

15. With respect to the silica content, the prior art, which is attributable in large measure to Hollingsworth, had clearly indicated since 1946 that mixtures should contain about 2% to 6% of silica by weight. More specifically, it taught that the content should be less than 4% and preferably less than 3%. *See, e. g.*, Patent No. 2,479,389 (Col. 2, line 29) [Maust and Hollingsworth, applied 1946, granted 1949]; Patent No. 2,839,377 (Col. 1, line 69) [Hollingsworth, applied 1951, granted 1958]; Patent No. 2,724,501 (Col. 1, lines 34–35) [Hollingsworth and Wester, applied 1954, granted 1955]; and Patent No. 2,839,361 (Col. 1, line 66) [Hollingsworth and Williams, applied 1954, granted 1958].

16. The actual practices utilized by the industry were not uniform. In the late 1930's American Cyanamid's beneficiation processes reportedly resulted in products with a 4–6% $SiO_2$ content. IMC, according to the testimony of Witness Guffey, had been using a silica specification of approximately 3½%

since the early 1950's which was lowered to 3% or less around 1953 or 1954. The documentary exhibits do not appear to support his degree of claimed specificity; however, the silica content in IMC samples generally appears to be in the 2–6% range for 77 BPL rock used during the 1950's. The various predecessors to Borden, including Coronet and Smith-Douglass, (which originally employed Hollingsworth) generally used a 3% silica feed.

In February 1960, Smith-Douglass (now Borden) purchased phosphate rock from IMC, for use in the '437 process, specifying 75–77 BPL and 2.5 to 3.5% SiO2. The documentary record shows increased attention to SiO2 by IMC thereafter which had not been the case previously.

17. During the 1950's IMC used the Butt Mol Ratio which is as follows:

$$\frac{CaO + MgO + Na2O + K2O - SO3 - F2}{P2O5 - Fe2O3 - Al2O3}$$

is between 2.7 and 3.1

The ratio does not include reference to SiO2, notwithstanding IMC's claim of specifying 3% or less. In August, 1960, shortly after the rock purchase noted above, IMC appears to have shifted to the use of Hollingsworth's '377 Patent Mol Ratio formula which is as follows:

$$\frac{CaO + Na2O - 3P2O5 \text{ is}}{SiO2}$$

between 1.3 and 2.8

This formula recognizes a role for SiO2. It is the opinion of the Court that IMC gained an awareness of the role of SiO2 from contemporary actions of the plaintiff.

Rocky Mountain Phosphate, which was formed in 1959, obtained much of its knowledge from IMC. When Rocky Mountain converted to a soda-acid process in 1965, which was shortly after IMC shut down its Wales, Tennessee, operation, it appears that Rocky Mountain obtained much expertise from IMC, including that relating to low silica feed charge mixtures.

Hooker Chemical Company, in Galena Park, Texas, had been searching during the 1950's for a non-polluting method. A 1962 Hooker report, referring to a 1955 study discussing Smith-Douglass' low SiO2 (under 4%) process, noted that the SiO2 Control was contrary to Hooker's supposition. In 1967 Hooker personnel visited the Rocky Mountain Phosphate operations, by then operating under a '437 patent license, and took particular note of the low SiO2 control.

In 1963 Occidental employed Guffey who had been working with IMC. In 1968 Occidental acquired Hooker. It appears that Occidental acquired its knowledge of low SiO2 from these contacts with IMC.

In sum, it appears to this Court that most, if not all, of the industry became aware of the need to maintain a low SiO2 content (less than 4% and preferably less than 3%) directly or indirectly from the operations of Borden's predecessors although most had been operating generally in the 2–6% SiO2 range. Nevertheless, this was a modern recognition of that which was taught and contained in the prior art and thus available to the industry upon research, study and use. Since Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, this Court concludes that these facts do not rise to the level of being "secondary considerations" as described more fully in the Conclusions of Law.

*Added Phosphoric Acid:*

18. Generally speaking, the use of phosphoric acid, commonly referred to as added P2O5, in the feed charge enriches the % P of the final calcined product. Additionally, added P2O5 increases the rate of defluorination which, in turn, results in an increased rate of feed to the kiln and hence increases production rates. As an enriching agent, it may be added up to about 12% by weight of the feed charge; beyond that amount, under present processes, the P2O5 tends to volatilize and be wasted.

19. The prior art reveals the value and role of increased P2O5. *See, e. g.,* Patent No. 972,567 (Newberry, applied 1909, granted 1910); Patent No. 2,562,-718 (Hollingsworth, applied 1947, granted 1951). *See also,* Nagai, Ando, and Sakamaki, "Calcined Phosphatic Fertilizers VII", *The Journal of the Chemical Society of Japan, Industrial Chemistry Section,* Vol. 56, pp. 922–24 (Dec., 1953).

The Court recognizes plaintiff's argument that the Ritter patent, Patent No. 2,337,498 (applied 1939, granted 1943) tends to teach a limitation on added P2O5. The Court takes note of what appears to be cost concern by Ritter (Col. 2, lines 1–3) which, as will be noted hereafter, was a major deterrent to use of phosphoric acid. Furthermore, in the early 1940's there was not the same degree of socio-economic pressures to reduce pollution which later appeared.

20. Equally significant to the prior art is the fact that production histories in the defluor industry reveal the use of increased P2O5 over the years, generally in small increments. For example, IMC added it to feed mixes in the late 1940's, increasing their products from about 14% P to 16% P and later aiming at 17% P; IMC was limited by kiln size or design as to the amount of feed that could be processed. In the early 1950's, IMC's Wales plant enriched a sulfuric acid product with P2O5 to make an 18% P product. In tests conducted in 1955, Borden increased P2O5 additions from 5.5% to 9%, seeking to make an 18% P product, but was restricted by mechanical limitations of the feeders. At about the same time, IMC reports revealed a recognition that added P2O5 resulted in easier defluorination, although IMC was then maintaining a Butt Mol Ratio of about 3.0. In 1956, IMC conducted tests using feed mixes prepared by an IMC plant in Florida; the feed mix using triple super phosphate resulted in a Mol Ratio of approximately 1.0. IMC's production department urged use of increased P2O5 at Wales, but that facility lacked suitable equipment. In 1957, Butler and Smith-Douglass personnel engaged in intra-company debates regarding increasing the amounts of added P2O5 versus the costs involved.

In June, 1957, Hollingsworth of Smith-Douglass reported that the use of "high reagent" feed containing 8% P2O5 "conclusively demonstrated" increased production rates, significantly reducing burning problems and improved potential profits. Later the Hollingsworth reports discussed P2O5 additions up to as much as 10%.

21. The record also reflects that increased use of P2O5 was a means for reducing pollution problems. Much of the industry had been using sulfuric acid in the calcination process. The defluorination process resulted in heavy concentrations of pollution, particularly SO2 and SO3, escaping up the stack. The record reveals industry shifts towards use of sodium carbonate and increased use of phosphoric acid, both of which contributed substantially to reducing pollution.

During the 1950's most, if not all, companies in the defluor industry were plagued with pollution concerns, suits and pressures from state agencies. Companies tried stack emission "scrubbers", water sprays and other devices, as well as adjustments of their chemistry, in attempts to reduce pollution.

22. Balanced against the usefulness of added P2O5 was its high cost and availability. Numerous references in the record indicate a particular concern over the economics of processes using phosphoric acid. For example, in June, 1957, Smith-Douglass production personnel chose to start cutting back on added P2O5 until a scale was developed from which the most economical feed preparation for any required monthly production, as determined by sales, could be determined.

The prior art also made some reference to cost. For example, Patent No. 2,562,718 (Hollingsworth, applied 1947, granted 1951) pointed out (Col. 3, lines 11–14) that "practical and economic considerations" limit phosphoric acid that can be mixed with the rock to about

25%. *See also* the '437 patent, column 2, lines 13–25.

23. As the plaintiff correctly points out, current defluorination operations do not involve making only a "simple" addition of P2O5 to the prior art soda-acid mixtures. The chemistry of the calcination process has been and is a highly complex operation in which even today all the reactions that occur are not fully understood. With each change in a mode of operation, whether it be temperature, speed of kiln rotation, modification of temperature controls, or chemistry changes, substantial effort was and is required to stabilize the operations to ensure that availability remained high, that the P/F was greater than 100, and that the operation was as economical as possible. Similarly, the decision to add additional P2O5 was dependent on many factors; *see* Findings of Fact Nos. 35, 54. Nevertheless, the Court is of the opinion that the defendant is correct in its assertion that the principal difference between the '437 patent process for making 18% P products and the prior practices for making 17% P products is the addition of additional P2O5 in the feed charge.

*Equipment:*

24. The record reflects that equipment problems and limitations had a substantial effect on the various processes used over the years, some of which have already been noted. For example, much of IMC's Wales plant was built in the late 1800's, and in 1956–57 it was unable to duplicate its own processes developed at its Mulberry experimental station. Wales also had kiln limitations and temperature control difficulties. Smith-Douglass had feed supply problems, power equipment failures and problems with nodulizing and beneficiation equipment. All producers reported difficulties with refractory, burners, dust losses and kiln operations. The high cost of replacement equipment undoubtedly retarded faster development of the chemical processes; as in any industry, however, economics at any given point in time was and is a central concern.

*Borden's Prior Art Process for 17% P and The '377 Patent Describing It*

25. For many years prior to filing the '437 application, Borden through its predecessor Smith-Douglass had practiced the soda-acid process by adding Na2O and P2O5 to phosphate rock having a low silica content of 2.5% to 3.5%. The feed mixture was heated in the presence of water vapor and, as was the practice in the industry, to a temperature below its fusion point in order to produce a product with above 17% P, a high fertilizer availability and a low fluorine content (P/F greater than 100). From 1952 through April, 1957, the amount of added P2O5 was about 5% by weight; from May, 1957, to April, 1958, all more than one year prior to the filing of the '437 patent application, the amount of added P2O5 was 6.5% or greater, reaching a maximum of nearly 8.5% during testing periods.

26. During the period 1952 to 1958, it was generally known at Smith-Douglass that the addition of P2O5 in excess of 7% by weight increased the rate of production. When, in August, 1958, Smith-Douglass added P2O5 in excess of 7% pursuant to a decision to sell an 18% P product, it did so in the expectation that the rate of production would be increased. In October, 1958, it was reported that an anticipated 8,500 tons per month, or 102,000 tons per year, of 18% product could be produced with existing equipment and appropriation requests already submitted; a June 10, 1957, report indicated that based upon data then available, it was "reasonable to assume" a capacity of 116,375 tons per year of 17.8% P product with existing equipment. The increase in production which did occur in 1958 was no more than had been earlier obtained in plant production with a P2O5 addition in excess of 7%.

27. Prior to using the '437 patent process, Smith-Douglass utilized a soda-acid process to make a 17% P product as described in Patent 2,839,377 [Hol-

lingsworth and Williams] (filed 1951, granted 1958; hereinafter cited as the '377 patent). Smith-Douglass in 1951 was commercially selling a 14.5% P product. The 17% P product made by the '377 patent process was mixed with limestone to cut back the % P to 14.5%. Beginning about 1953, Smith-Douglass discontinued marketing the 14.5% P product.

The '377 patent process utilized the Mol Ratio formula described in Finding of Fact No. 17, *supra*, with a mol ratio of 1.3 to 2.8. The '377 patent described use of phosphate rock containing from about 2–6% $SiO_2$. It described the addition of from 3–6% $P_2O_5$ and taught how the amount of $Na_2O$ to be added changes as the amount of $P_2O_5$ was increased. Furthermore, it set out two of the ratios incorporated into the claims of the '437 patent, the first being the ratio

$$\frac{\text{Mols } CaO + Na_2O - 3P_2O_5}{SiO_2}, \text{ commonly}$$

referred to as the "feed mol ratio", and the ratio of added $Na_2O$/added $P_2O_5$.

### The '437 Patent "Invention"

28. The alleged specificity of '437 patent claims Nos. 1 and 10, which are representative of all the claims of the patent, are reportedly imposed by the metes and bounds of six claim limitations, each one of which is a parameter limiting the area covered by the claims. The Hollingsworth '437 Patent mol ratio formula is:

$$\frac{CaO + Na_2O - 3P_2O_5}{SiO_2} \text{ does not exceed } 1.1$$

The limitations are:

(1) the weight ratio $\frac{\text{added } Na_2O}{\text{added } P_2O_5}$ must be between .5 and .8;

(2) the $P_2O_5$ addition must be between 7% and 12% of the feed charge;

(3) $\frac{\text{(total) mol } Na_2O}{\text{mol } P_2O_5 \text{ (in the rock)}}$ must be between .3 and .7;

(4) the $SiO_2$ in the feed charge must be between 2% and 6%;

(5) the mol ratio (MR) of the charge must be below 1.1; and

(6) the temperature must be at least 2200°F and below the fusion point.

29. The claimed inventive concept in the '437 patent lay in the addition of added $P_2O_5$ in excess of about 7% by weight and "proportioning" the relative amounts of constitutents so as to maintain a value of the MR less than 1.1.

30. The '437 patent does not explain or teach any chemical or physical significance or criticality to the numerical value of 1.1 or any other numerical value of the MR. Borden production data reveals no critical changes in the ratio where added $P_2O_5$ is in excess of 7% by weight. On the contrary, the evidence reveals a continuum of MRs that change proportionately with the amount of $P_2O_5$ added, the % P of the product sought, and the best mode of operations.

31. Although the Borden evidence of its in-house use of the '437 patent is somewhat ambiguous, it does seem that the formula offers practical benefits for operational control of the soda-acid process by supervisory personnel. The '437 ratio and claims appear to encompass the most efficient, best operational and most economical ranges for producing a successful 18% P defluorinated phosphate rock product by means of a soda-acid process. As such it does not, in this Court's opinion, mark the claims of an invention, but distills the learnings of trial and error operational practices seeking to determine optimum ranges of those factors noted in Finding of Fact No. 23, *supra*.

32. There is some evidence of the use by others of the Hollingsworth mol ratio formula, particularly as found in the '377 patent described in Finding of Fact No. 17, *supra*. In August, 1960, IMC first made reference in a report to the '377 mol ratio formula. During the next several months, IMC reports cited it in connection with an 18% process which strongly suggests that it was being used

as a possible tool for developing the optimal operational parameters of the IMC 18% soda-acid process. Additionally, some of the computations evidence legitimate concern over potential infringement, while other computations evidence Occidental's deliberate attempt to operate outside the ranges mentioned in the '437 patent. At most, use of the '377 mol ratio formula narrowed the ranges of operational trials and errors through which IMC would naturally and obviously have moved in determining the most economical and efficient ranges of operation for all the variables involved in the soda-acid, 18% P process.

There is no evidence of use of the mol ratio formula by Rocky Mountain, although conceivably since it did learn some of the operational benefits of a soda-acid process from IMC it could have indirectly received benefits of the MR. Nevertheless, the evidence reflects that both IMC and Rocky Mountain, relying primarily upon their own skill and operational procedures, independently achieved an economical and well-operating soda-acid process which inherently fell within the ranges claimed by the '437 patent. Notwithstanding this progress, IMC had substantial production problems using its old equipment at Wales. IMC management ultimately decided to abandon the building of a new plant and the conducting of substantial replacements and elected to withdraw from the defluor industry in 1965.

33. The '437 patent added nothing new to the teachings of the prior art or practice, either as to the phosphate rock to be used in defluorination or as to the amount of silica in the feed mixtures.

34. There was not introduced in the '437 patent any new combination of compounds or any new physical treatment of an old combination. Nor was the '437 patent an improvement within the meaning of the patent law. Compared to Borden's own prior art process for making a 17% P product (which the evidence shows was in actuality often practiced to make a product having a higher amount of P, but cut back by the addition of limestone and sold as 17% P) and the description of it in the '377 patent, all that was done was to add more $P_2O_5$ to increase further the phosphorus content of the final product and to add an amount of $Na_2O$ in a manner self-evident, to those skilled in the art, from Borden's own description of its prior art process.

35. The decision to add more $P_2O_5$ was dependent upon many factors, including the desire to minimize pollution emissions, the desire to increase production to meet anticipated increased sales, the desire to operate more easily which the high reagent feed permitted once supporting equipment had been obtained, and the desire to raise prices and profits which the higher % P product would allow on the open market.

36. After selling a 17% P defluorinated phosphate product made by the soda-acid process for some seven years, Borden announced on April 1, 1959, that it would discontinue the sale of 17% P material and would "direct its entire effort toward the production of 18% phosphorus grade . . . ." On April 23, 1959, it filed the '437 application. All of the defluorinated phosphate products given as examples in the '437 application were between 18.0% and 18.6% P.

37. Although labelled an "unexpected increase" by Borden (Smith-Douglass) to induce the Patent Office to issue a patent, Borden's own production data shows that the increased rate of defluorination which it obtained by increasing the amount of the addition of $P_2O_5$ resulted in nothing more than a difference in degree taught by the prior art. As noted in Finding of Fact No. 26, *supra,* the increase was not "unexpected", even by Borden.

### The Prosecution of the '437 Application

38. The prior art cited to the Patent Office examiner did not make specific reference to the amount of $Na_2O$ based upon the $P_2O_5$ content of the phosphate rock. The applicant Hollingsworth unequivocally asserted to the examiner

that " . . . in applicant's process the total amount of Na2O in the charge is between about 0.3 mol and 0.7 mol present in the phosphate rock whereas this limitation can not be found in either of the cited patents".

39. This Court has already noted in Finding of Fact No. 13, *supra*, the existence of prior art teaching the amount of Na2O relative to the P2O5 content. Of particular concern to the Court is the failure of the applicant to cite the Ritter patent to the Patent Office. The Ritter patent is within a class and subclass searched by the patent examiner for the '437 patent. The record reflects that this examiner was the same person who searched Hollingsworth's prior '377 patent application at which time the Ritter patent was searched and became the focal point of concern before the '377 patent application was granted. Nevertheless, the record demonstrates that approximately five years passed between these respective searches. The record also reflects that Hollingsworth advised his patent attorney, with regard to the '437 application, that "Ritter's process is perhaps the most similar to our own". Under these circumstances the Court concludes that the Ritter patent should have been cited specifically to the patent examiner.

40. The absence of the full teachings of the prior art pertaining to the amount of Na2O based upon the phosphate rock P2O5 appears to have been a material factor in the allowance by the Patent Office of the '437 claims.

41. The applicant Hollingsworth amended the original claims in the '437 application to change "maintaining" to "proportioning" in order to meet the examiner's objections that the word "maintaining" was functional and did not define the actual steps contemplated. This amendment, coupled with the applicant's statement that, as amended, the claimed steps were defined " . . . affirmatively in terms of the action actually contemplated" requires actual use in the processing of phosphate rock on a regular basis of the ratios incorporated

in the '437 claims, or their substantial equivalent, *if infringement is to be found*. These ratios could be translated into weight ratios in terms of pounds, gallons or some similar unit of measurement of each of the ingredients incorporated into the feed process.

42. There is nothing in the record to establish that other prior art of record here, such as the then pending applications which resulted in Patent No. 2,997,367 (Williams, filed 1956, granted 1961) or Patent No. 3,058,804 (Tynan, filed 1957, granted 1962), or issued prior art patents such as Patent No. 972,567 (Newberry, filed 1909, granted 1910) or Patent No. 2,442,969 (Butt, filed 1946, granted 1948) were considered by the Patent Office examiner. The Court is aware that the Williams and Butt patents are in classes and subclasses searched by the examiner; the record does not reflect the classifications of the Newberry and Butt patents.

There is nothing in the record which suggests that the examiner appreciated the significance of such prior art as Patent No. 2,995,436 (Hollingsworth and Kirkland, filed 1957, granted 1961) insofar as teaching the claimed subject matter of the '437 patent.

43. The couching of the soda-acid mixtures of the patent claims in terms of numerical values of ratios necessarily placed a heavy burden upon a busy examiner as demonstrated by the number of calculations that were required at trial to show the sameness between the prior art and the '437 claims coupled with the explanations of those persons skilled in this art. This further weakens the presumption of patent validity.

### The Obviousness of the '437 Claims

44. The level of ordinary skill in the defluor industry was high in the 1950's. High temperature calcination required control of temperatures, feed mixtures and rates, stack gas temperatures and pressures, chemistry and equipment operating conditions. It required knowl-

edge of the effect of chemical additives upon the fusion temperature of the mixture being defluorinated. It required concern for operating conditions intended to produce maximum allowable production, depending upon sales, consistent with cost and quality specifications. Knowledge of equipment operation and maintenance played a substantial role. It also required the capacity to adjust to modified operating conditions, when attempting experiments involving different feeds or operating conditions with existing equipment.

45. The prior art is anticipatory as well as demonstrative of the obviousness of the claimed subject matter of the '437 patent. The difference between the prior art and the '437 claims was a small matter of degree depending substantially upon the process and % P product desired. The prior art materials heretofore discussed demonstrate that the soda-acid process was known, that the effects of silica, added P2O5 and added Na2O in feed mixtures used were known, that the phosphate rock to be used was known, and that an 18% P product was known.

It was not until a market and demand for 18% P appeared that the need to develop an 18% P soda-acid process arose; the means used for successfully and economically meeting that need were obvious to those with ordinary skill in the art, notwithstanding the patience, time and effort required to develop the process controls and determine the operational parameters desirable for greatest efficiency and economy. The '437 process was a carrying forward of an original process involving only a change in proportions.

46. The course of events at Borden preceding the asserted "inventive act" of Hollingsworth shows the commonplace nature of the '437 patent. The asserted "inventive act" consisted only of the calculation of values of feed mol ratio made subsequent to the introduction of the feed mixtures into commercial production. The latter was done pursuant to a Borden decision to upgrade its defluorinated phosphate product from 17% P to 18% P. The fact that the feed mixtures were used on a plant-wide basis prior to the asserted inventive act conclusively shows that there was no technical deterrent to doing what was later claimed in the '437 patent.

47. The fact that Hollingsworth reported in June, 1957, that it was "reasonable to assume" exactly that which became the "inventive act" of late 1958 demonstrates the lack of a technical deterrent as well (see Finding of Fact No. 26, supra).

48. The difference between the Ritter patent and the '437 claims was only in the amount of P2O5 added. As has been noted previously, the Ritter patent described the role of Na2O, added P2O5, silica in the 2–6% range, and calcination to produce a defluorinated product with high availability.

The obviousness of the ranges claimed in the '437 recitations is demonstrated by the fact that simply by addition to the examples in the Ritter patent (where the amount of P2O5 added gave products having from 15.7% to 16.5% P) of an amount of P2O5 sufficient to produce an 18% product gives, upon calculation, values within each of the ranges. As noted in Finding of Fact No. 19, supra, the Court is not persuaded that Ritter in 1939 taught a limitation to the use of P2O5 which would be binding upon one of ordinary skill in the art in the 1950's.

49. The foregoing teachings of the prior art made it obvious that, for defluorination, a good grade of phosphate rock in the grade from 72% BPL to 78% BPL with 2–6% SiO2 should be used. This rock has been and is available within the United States by using selective mining and beneficiation techniques which have been available for many years. These teachings revealed that to such rock should be added an amount of Na2O based upon the amount of P2O5 in the rock, as taught in the Ritter patent, and that an amount of P2O5 should be added which would result in the desired phosphorus content in

the product. For product grade of 18% P with a P/F greater than 100, calculations based upon mixtures prepared as described above generally give values within the ranges claimed in the recitations of the '437 patent.

50. Separately, one skilled in the art, wishing to make an 18% P product, would with the '377 patent before him calculate the amount of added P2O5 required to enrich the rock mixture to the 18% P grade and would follow the teaching within that same patent as to the addition of Na2O. Upon applying this teaching to the phosphate rocks described in the '377 patent, subsequent calculations based upon the feed mixtures formulated solely on the basis of this prior art give, for each of the three phosphate rocks, numerical values within each of the ranges in the '437 claims (with the insignificant exception of a value of 1.11 for the feed mol ratio for one rock). As noted earlier, the '437 patent teaches no chemical or physical criticality to the 1.1 feed mol ratio.

51. Separately, one skilled in the art, wishing to increase the rate of defluorination by adding the amount of P2O5 taught in Patent No. 2,562,718 (Hollingsworth, applied 1947, granted 1951) (0.36 mols P2O5 per mol rock P2O5), the same amount preferred in the '437 patent, would determine from the '377 patent the amount of added Na2O. In applying the teaching of the '718 patent together with the teaching of the '377 patent to the phosphate rocks described in the '377 patent, feed mixtures are formulated as to which subsequent calculations give numerical values within each of the ranges in the '437 claims.

52. There was nothing in the prior art or industry practice, other than cost, to deter a person having ordinary skill in the art of defluorination of phosphate rock from increasing the amount of P2O5 addition over that described in the Ritter or the '377 patent to make an 18% P product to meet, or attempt to set, a trade preference. To the contrary, the prior art teachings pointed in this direction. For example, the '718

patent did so by describing the additional benefit of improved defluorination while noting that practical and economic considerations limited the amount to about 25%. The '377 patent also invites increased additions, noting that ". . . the amount of added P2O5 . . . being determined to a large extent on the current availability of phosphoric acid, and being preferably between 5 and 6%".

53. To those skilled in this art, the differences between the '377 soda-acid process for a 17% P product and the '437 soda-acid process for an 18% P product were slight to begin with. This, too, was the case as to the differences between the Ritter soda-acid process for a product of about 16% P and the '437 soda-acid process for an 18% P product. The addition of some more P2O5 and Na2O to make the '377 process and the '437 process identical as well as the addition of just P2O5 to make the Ritter process and the '437 process identical were obvious expedients which flowed as a natural consequence from the prior art teachings. Against the background of the prior art discussed heretofore, the obviousness of what was patented in the '437 patent is apparent.

54. The '437 process involved a combination of factors, including the above skills and knowledge, adequate equipment capable of handling the increased productivity and feed flow, and the sales capacity to move the 18% P product. Efficient operation under the process also required operational experience under the new levels and controls. In the same manner that the industry adjusted to new operating procedures as the % P products increased from below 10% P to 14% P, 16% P and then 17% P, the industry (beginning with Borden) adjusted to the 18% P soda-acid process. In fairness to the plaintiff, the record reflects that while others had previously produced an 18% P, Borden was the first to utilize its expertise, modify or add the necessary equipment, and take the risk of changing entirely to a different % P product by means of the soda-

acid process. Borden's gamble was successful in that its sales department was capable of making the venture profitable and, in essence, raised the trade standard to a higher % P. By being able to charge a higher price for 18% P, as compared with 17%, as well as take advantage of the greater operational economies, Borden was able to gain a temporary market advantage which worked to its economic benefit.

### The "Secondary Considerations"

55. The plaintiff has placed much emphasis upon activities of other companies in defluorination of phosphate rock by the soda-acid process in an apparent effort to show their own failure or efforts to copy Borden's procedures. It is clear that where patentable invention is lacking, as here, such factors cannot validate a patent.

56. It is understandable from the record why the plaintiff contends that there are secondary considerations involved. As noted previously, it appears that IMC was not closely concerned with maintaining $SiO_2$ in the 2.5–3.5% range before 1960; the plaintiff virtually told its "secret" to IMC with the rock purchase of that year. The evidence also reveals IMC's use of the Hollingsworth mol ratio which may have aided IMC in determining optimum operating ranges more swiftly. Similarly, Hooker was made aware of the value of low $SiO_2$ indirectly from the plaintiff, via Rocky Mountain and IMC. Ultimately, Occidental's expertise was derived through Hooker and IMC. Nevertheless, the Court concludes that IMC, Rocky Mountain, Hooker and Occidental learned nothing new from Borden's operations that was not available in the prior art.

57. The Court has closely considered the '437 patent claims and the industry history as revealed in this record. First, as to Rocky Mountain, Borden's only licensee under the '437 patent, the record reveals that it entered into a license solely because it could not undertake the financial burden of expensive patent litigation. Second, plaintiff has not demonstrated that there is any connection between the activities of any of the parties mentioned and that which was asserted as the primary inventive concept in the '437 patent, namely the addition of added $P_2O_5$ in excess of about 7% by weight.

### The Anticipations of the '437 Claims

58. Borden claims August, 1958, as the date of the Hollingsworth invention, the application for which was filed on April 23, 1959. For present purposes, the Court will assume that August, 1958, was the date of the "invention" claimed herein, since August was the month when Borden added $P_2O_5$ in excess of 7% pursuant to a decision to sell an 18% P product.

59. Between October, 1953, and December, 1957, a Japanese writer, Jumpei Ando, published five articles in the Journal of the Chemical Society of Japan which separately described the defluorination of mixtures of phosphate rock, silica, added $Na_2O$ and added $P_2O_5$. These articles disclose mixtures which upon calculation give values within the recitations of the '437 claims. Moreover, the teachings contained within the articles and the characteristics given for the resulting products clearly indicate the desirability of such mixtures. Not only do these articles indicate that the state of the art outside of this country was high, but also the Court reaches the conclusion that the level of skill in the United States defluorination industry during the 1950's was sufficiently high to appreciate the Ando teachings. The mixtures anticipate the claimed subject matter of the '437 patent. The content of this prior art made the selection of the feed mixtures described and claimed in the '437 patent no more than the reading of a list and the selecting of a known compound to meet known requirements.

60. The book entitled "Industrial-Chemical Studies on Fused and Calcined Phosphate Fertilizers" by Jumpei Ando bears on its last page a date of publica-

tion of June 30, 1958. The record reveals that the book is a compilation of several reports and studies conducted by Dr. Ando, some of which have been cited elsewhere in this opinion. The manuscript for this book was completed in February, 1958, and 500 copies were printed and delivered to the Japanese Fused Phosphate Fertilizer Association around late May or early June, 1958. Shortly thereafter, approximately 200 copies were distributed to various universities, colleges, libraries and research institutes in Japan. This book is thus a printed publication within the meaning of 35 U.S.C. § 102(a) pre-dating the date of the purported invention of the subject matter of the '437 patent.

In Chapter 9 of this book there is described calcination at high temperatures of mixtures of phosphate rock, silica, added $Na_2O$ and added $P_2O_5$ to produce phosphate products having high fertilizer availability. Upon calculation, the described feed mixtures give values within each of the recitations of the claims of the '437 patent. This prior art is separately anticipatory of the subject matter of the '437 patent.

61. Patent No. 972,567 (Newberry, filed 1909, granted 1910) was directed to the soda-acid process and taught the amount of $P_2O_5$ and $Na_2O$ that should be added based upon the $P_2O_5$ content of the phosphate rock. The evidence shows that when the mid-range of the Newberry teaching is used as the basis for the addition of $Na_2O$ and $P_2O_5$ to Florida phosphate rocks typical of those which would be selected for defluorination (72–77 BPL, 2–6% $SiO_2$), in each case in which the amount of added $P_2O_5$ is in excess of 7% and less than 12%, calculation reveals a feed mol ratio value of less than 1.1. This is the same as the asserted inventive concept of the '437 patent.

62. The asserted inventive concept of the '437 patent is shown by calculations based upon feed charge mixtures prepared for defluorination of phosphate rock and described in Patent No. 2,997,367 (Williams, filed 1956, granted 1961), Patent No. 3,058,804 (Tynan, filed 1957, granted 1962), and Patent No. 3,078,156 (Yamaguchi, filed 1957, granted 1963). Each of these patents described a feed charge mixture which is anticipatory of the concept asserted as inventive in the '437 patent. Each of these patents was granted on an application for patent by "another" filed in the United States before the date of invention upon which Borden is entitled to rely with reference to the subject matter of the '437 patent and separately invalidates the '437 patent under 35 U.S.C. § 102(e).

63. The prior art feed mixture described in the example of the Williams patent is fully within the claimed ranges of the '437 patent claims. The Court recognizes plaintiff's argument that Williams' stated purpose was to meet the industry P/F greater than 100 standard, notwithstanding his results of producing a P/F of 2000. Nevertheless, the Court concludes that others of ordinary skill in the art are not bound by the fact that Williams utilized a fusion process. One skilled in the art could stop with the product after the first stage, as taught by Williams, and have an 18% P product with higher fertilizer availability and a P/F of 100. Anticipation cannot be avoided by eliminating a step and its corresponding function.

64. The prior art materials discussed above as anticipation of the claimed subject matter of the '437 patent also separately show the obviousness of that subject matter.

*Borden's Invalidating Commercial Exploitation*

65. As noted briefly in Findings of Fact Nos. 20 and 22, the record reflects that in May and June, 1957, Borden utilized "high reagent feed" on a commercial basis which, in this Court's opinion, went beyond mere experimentation. Borden sought to develop a production "scale" whereby the amount of added $P_2O_5$ was varied to meet production demands. The record reflects that operations and research personnel were desir-

ous of using a 10% added P2O5 feed charge in order to obtain "valuable operational data". However, management was concerned with keeping costs low and production nearer market levels. This high reagent feed was proportioned so that the value of the mol ratio was about 1.3. In all other respects, the high reagent feed was commercially available and utilized as necessary, the processing by which it was defluorinated falling squarely within what was later claimed in the '437 patent.

66. In use, the high reagent feed was commercially successful in that Borden achieved new high record production and realized other benefits which contributed to increased profits. The feed rates obtained through use of the high reagent feed were as high or higher than the purportedly "unexpectedly high" feed rates reported in the '437 patent. *See also* Finding of Fact No. 26, *supra.*

67. In commencing to use the high reagent feed in 1957, Borden's main purpose was to increase its profits through increasing its production, and any experimental purpose that it may have had was merely incidental to its main commercial purpose. Upon realizing the obvious potential of the high reagent feed, Borden continued to exploit that potential solely for commercial benefit.

### Claimed Invalidity Under 35 U.S.C. § 102(f)

68. Defendant Occidental contends that the evidence reveals that Paul D. Tillman, then a Borden research technician, prepared a memorandum in 1956 which reveals that Mr. Hollingsworth was not the inventor of the process which became the basis of the '437 patent. The evidence with respect to claimed invalidity under 35 U.S.C. § 102(f) is in this Court's opinion, insufficient to render an informed judgment. The slim proof presented by Occidental is equally consistent to show the obviousness of the '437 patent.

### Borden's Attempt to Eliminate Kirkland as an Inventor of Patent No. 2,995,436

69. On October 14, 1971, Borden filed an ex parte petition seeking a Certificate of Correction from the U. 'S. Patent Office deleting the name of William A. Kirkland as one of two joint inventors named in Patent No. 2,995,436 (Hollingsworth and Kirkland, filed 1957, granted 1961). The Certificate of Correction was issued December 21, 1971. This action was taken approximately ten years after the patent issued and was done during the pendency of this litigation without notice to Occidental. Borden's action before the Patent Office was not instituted until after Occidental's discovery, including its deposition of Mr. Hollingsworth taken on May 6–7, 1961, revealed that the '436 patent as issued invalidated the '437 patent under 35 U.S.C. § 102(e). This action was taken by Borden in an effort to avoid the use of the '436 patent as prior art under 35 U.S.C. § 102(e).

70. Upon discovering in June, 1972, that a Certificate of Correction had issued with respect to the '436 patent, Occidental apprised the Patent Office of the involvement of this patent in this litigation and was informed that if Borden's ex parte petition to the Patent Office had revealed that issuance of the Certificate could lead to a dispute as to inventorship which would be subject to Court decision, the Patent Office would have withheld action on the petition until after the Court had made a decision.

71. The record reflects that on June 20, 1957, W. A. Kirkland and J. H. Snyder issued a report on nodulization wherein Kirkland was represented as having extensive experience and as having made all experiments discussed therein. On November 29, 1957, the '436 patent application was filed naming Kirkland and Hollingsworth as co-inventors. The remaining record is somewhat ambiguous as to the true role of Kirkland in the invention of the '436 patent. Kirkland's deposition is valueless, and he was not subpoenaed to testify by either

party. The record is limited to the affidavit of Kirkland submitted with respect to the Certificate of Correction of the '436 patent, the foregoing 1957 report, the testimony and affidavit of Hollingsworth, and the fact that Hollingsworth voluntarily and deliberately sought to make the joint application in 1957. Considering the record as a whole, the Court concludes that the evidence supports a finding that Kirkland was in fact and in law a co-author of the '436 patent. With the '436 patent having been properly filed, Hollingsworth and Kirkland are in combination "another" within the meaning of 35 U.S.C. § 102(e), thus making the '436 patent prior art as to the '437 patent.

72. The '436 patent describes the production of an 18% P defluorinated phosphate product by means of the soda-acid process. Borden has asserted its claims of infringement simply on the basis of exactly what is taught in its own prior art '436 patent. The '436 patent describes feed mixtures which upon calculation give values within each of the ranges claimed in the recitations of the '437 patent. The '436 patent describes defluorination of such mixtures at temperatures above 2200° and below the fusion point of the mixtures to provide products having high fertilizer availability and a P/F greater than 100. The '436 patent is a patent granted on an application filed in the United States by "another" before the invention thereof by the applicant of the patent in suit, thus separately invalidating the claims of the '437 patent under 35 U.S.C. § 102(e).

*IMC's Invalidating Work*

73. Research was conducted by IMC in 1955 and early 1956 on a process for defluorinating and enriching phosphate rock by the addition of phosphoric acid and sodium carbonate (the soda-acid process) and heating the mixture at an elevated temperature near its fusion point. The research resulted in the reduction to practice of the soda-acid process and successful production in a pilot plant rotary kiln operated at a temperature of 2400°–2500° F of a defluorinated phosphate rock product having a grade of 18.5% P, a phosphorus to fluorine (P/F) ratio greater than 100 and a high fertilizer availability (a minimum of 90% P2O5 citrate solubility). The results of this research were described in an extensive and detailed IMC report in April, 1956. Calculations upon the soda-acid formulations recommended in the 1956 report give values which constitute anticipations of the claimed ratios of the '437 patent. The subject matter of the '437 patent was thus known and used within the meaning of 35 U.S.C. § 102(a) at IMC in 1956 prior to any date of invention upon which Borden is entitled to rely with reference to the '437 patent.

74. The conversion of the Wales, Tennessee, production facility to the soda-acid process required capital expenditures for replacement of existing equipment to eliminate mechanical and physical problems encountered in plant-scale tests of the soda-acid process subsequent to 1956. These expenditures and conversion of the facility were delayed until air pollution problems attendant upon the commercially successful sulfuric acid-phosphoric acid process then in use at Wales could no longer be tolerated.

75. The IMC soda-acid process developed in 1956 was put into commercial production at the Wales facility commencing in June, 1960, by sequentially converting each kiln at the facility from the sulfuric acid-phosphoric acid process to the high capacity formulation recommended in the 1956 IMC report. The phosphate rock used in the soda-acid process had a silica content of 2–6%, a range which raises the fusion temperature of phosphate rock mixtures to be defluorinated, allowing the calcining operation to proceed at a higher temperature with an attendant higher rate of defluorination.

*Invalidity Under 35 U.S.C. § 112*

76. The evidence of record shows that defluorination of phosphate rock in commercial scale operations involves the processing each day of hundreds of tons of rock. It shows that estimates as to the content of those ingredients of the rock made a part of the feed mol ratio are based upon relatively small samples from these large amounts of rock and that the analyses for these ingredients are subject to significant errors. The purportedly critical limitations of values of the feed mol ratio, e. g., "less than 1.-1", made a part of the claims of the '437 patent cannot be calculated in commercial scale operations with the certainty or accuracy required under the patent laws. Equally significant is the fact that, as noted earlier, the feed mol ratio of 1.1 has no chemical or physical significance or criticality relative to which operational certainty could be achieved without possible infringement.

77. Occidental's evidence as to the results of the computation of this ratio based upon a number of laboratories giving analyses on check samples convincingly shows that the calculation of the feed mol ratio lacks any degree of certainty which would inform the public during the life of the patent of the limits of the monopoly asserted by the '437 patent. The claims of the '437 patent are therefore invalid because they do not distinctly claim an invention in accordance with the statutory requirements set out in 35 U.S.C. § 112.

*Occidental's Claimed Noninfringement*

78. The evidence of record shows that Occidental, both with respect to its Galena Park plant and with respect to its White Springs plant, selected for defluorination a good grade of phosphate rock having a relatively low silica content, added to that rock an amount of Na2O in accordance with the P2O5 content of the rock as taught in the prior art, and added an amount of P2O5 required to produce its 18% P product, and that it continues this practice. The evidence shows that in day-to-day operations, control as to the amounts of additives is based upon product specifications and that control of the process is directed to meeting specifications of a P content of 18% and a P/F greater than 100.

There is no showing that Occidental, either in setting up its process or in controlling its day-to-day operations, makes use of the added Na2O/added P2O5 ratio made a part of the claims of the '437 patent.

79. As noted previously, there has been a showing that Occidental gained some operational benefits from the plaintiff with regard to the value of 2.5 to 3.5% SiO2 in the feed mix (which is not specifically claimed by the '437 patent) as well as benefit from knowledge of the Hollingsworth mol ratio formula as used in both the '377 and '437 patents. The mere fact that Occidental's final product gives post-processing calculations which disclosed that the feed charge used results in values falling within the numerical limits of the feed mol ratio is, standing alone, immaterial; the '437 patent is essentially a process patent, not a product patent, although one claim is a "product by process" claim. The test is whether the accused has in all substantial respects followed the method as claimed.

This Court has concluded that the '437 patent is invalid on a variety of grounds, any one of which would preclude a finding of infringement. This is the critical point on which this case turns. If the Court were to be in error on the issue of patent invalidity, it would then be compelled to conclude that infringement had occurred. The soda-acid process utilized by Occidental is substantially identical to that utilized by Borden, the products are substantially the same, and the chemistry involved is substantially identical. It is the considered opinion of the Court upon examination of a difficult and complex record that active use of the mol ratio formula and its claims is not required in order to constitute infringement. The ranges are readily converted from percentages

into pounds, tons, or other measurements which may be, and presently are, utilized for day-to-day operational control. The variances between the two processes appear to be slight, thus rendering the processes legally equivalent. However, in view of the Court's finding of invalidity of the '437 patent, the issue of infringement is not controlling, since an invalid patent cannot be infringed.

### Borden's Fraudulent Conduct Before the U. S. Patent Office

80. The evidence unequivocally shows that prior to the filing of the '437 application the applicant Hollingsworth was fully aware of the teachings of Ritter, Patent No. 2,337,498. It also shows that the applicant understood the significance of the Ritter patent and that it presented a threat to the issuance of his patent. Considering the similarity of the '377 patent to the process claimed in the '437 patent in all other respects, the omission to inform the Patent Office that the claimed values for the ratio mols $Na_2O/rock$ $P_2O_5$ was taught in the Ritter patent (see Findings of Fact Nos. 39, 40, supra), and the affirmative representation made during the prosecution of the '437 application that this ratio did not exist in the prior art (see Finding of Fact No. 38, supra), falls short of meeting the uncompromising duty required of an applicant in his dealings with the Patent Office. The omission to do so represents fraudulent conduct in the procurement of the patent.

81. The evidence also shows that the applicant did not meet the requirements of absolute honesty and good faith disclosure in connection with the filing of the application. The applicant failed to reveal to the Patent Office that the prior art process as actually practiced by Borden had for at least seven years involved additions of $P_2O_5$ substantially in excess of the amount of 3.6% represented in 1959 in the '437 patent as the preferred practice of the prior art process (see Finding of Fact No. 25, supra).

82. The applicant Hollingsworth also represented to the Patent Office that an "unexpected" increase in feed rates was obtained when the amount of added $P_2O_5$ exceeded 7% and the feed mol ratio value did not exceed 1.1 when, in fact, the applicant knew and had known that such increases were expected (see Finding of Fact No. 37, supra).

83. The evidence shows that a production data point for one kiln was highly suspect, but in any event it did not justify drawing the curves with the discontinuity shown in the patent drawing. The fact that the combined feed rate for two kilns was utilized without full disclosure is minor; however, the record reveals unreasonable selectivity of production data periods for charting periods without adequate scientific justification. For example, the high reagent feed production in May-June, 1957, as well as the Underhill work in Kiln No. 3, showed no leveling off in productivity for added $P_2O_5$ in excess of 7% and a mol ratio of 1.3 or greater. Furthermore, the feed rate data for the second kiln as was admitted by Hollingsworth at the trial, did not show in any measure an "unexpected" increase in feed rate with increased $P_2O_5$ addition.

84. The representations of "unexpected" increases were inaccurate and were deliberately made for the purpose of procuring issuance of the '437 patent. Separately, this constitutes the practice of fraud on the Patent Office.

85. Applicant represented to the Patent Office that additions of $P_2O_5$ above 7% where the feed mol ratio was above 1.1 resulted in the leveling off of production and asserted that this was revealed by laboratory and pilot kiln data. In fact, applicant Hollingsworth had data from commercial production of substantial duration showing that above 7% added $P_2O_5$ and a feed mol ratio greater than 1.1 gave feed rates at least as high as those shown in the patent drawing for additions of added $P_2O_5$ greater than 7% and a feed mol ratio less than 1.1. The failure to disclose comprehensive production data which refuted the position advanced for patentability demonstrates the absence of that degree of

candor and disclosure required in proceedings before the Patent Office and, separately, constitutes the practice of fraud on the Patent Office in the procurement of the '437 patent.

## CONCLUSIONS OF LAW

### *Patentability—In General*

■ 1. The law provides that patentability is dependent upon three explicit conditions: (1) novelty, as described in 35 U.S.C. §§ 101, 102; (2) utility, as described in 35 U.S.C. § 101; and (3) nonobviousness, as described in 35 U.S.C. § 103. Graham v. John Deere Co., 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545, 553 (1966); Harrington Manufacturing Co., Inc. v. White, 475 F.2d 788, 794 (5th Cir. 1973), cert. denied, 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331 (1973).

2. The utility of the '437 patent is not at issue, and the legal requirements of usefulness appear to be satisfied. 1 Deller's Walker on Patents §§ 83 et seq. (2d ed. 1964) [hereinafter cited as *Deller*].

3. As the U. S. Supreme Court has recently pointed out,

The patent standard is basically constitutional, Article I, § 8, of the Constitution authorizing Congress '[t]o promote the Progress of . . . useful Arts' by allowing inventors monopolies for limited times. . . . [U]nder that power Congress may not 'enlarge the patent monopoly without regard to the innovation, advancement or social benefit gained thereby. Moreover, Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available. Innovation, advancement, and things which add to the sum of useful knowledge are inherent requisites in a patent system which by constitutional command must "promote the Progress of . . . useful Arts." This is the *standard* expressed in the Constitution and it may not be ignored.'

Anderson's Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258, 262 (1969).

### *Presumption of Validity*

■ 4. Upon the lawful issuance of a patent, there arises a presumption of validity; the burden of establishing invalidity rests upon the party asserting it. 35 U.S.C. § 282. It has been stated that:

. . . the presumption of patent validity may be rebutted only by a quantum of proof—whether it be called clear and convincing or beyond a reasonable doubt—which is greater than a mere preponderance of the evidence. One who seeks to rebut the presumption bears a heavy burden. *Harrington Manufacturing Co., supra,* 475 F.2d at 794, *quoting from* Hobbs v. United States, 451 F.2d 849, 856 (5th Cir. 1971). This presumption is weakened and may be overcome if the evidence discloses that the examiner was not shown or did not consider pertinent prior art during the prosecution of the application; conversely, presentation by the defendant of exactly the same prior art references relied on by the Patent Office reinforces the presumption of validity. AG PRO, Inc. v. Sakraida, 474 F.2d 167, 172 (5th Cir. 1973), on petition for rehearing, 481 F.2d 668 (5th Cir. 1973).

■ Construing the record as a whole, the Court concludes that the presumption of validity in this case has been seriously weakened. First, pertinent prior art was not specifically cited to the Patent Office, and there is no indication that the examiner considered and rejected it. This is particularly true with respect to the Ritter patent. While all or most of the remaining prior art was in subclasses searched by the examiner, there is no indication that they were considered and rejected. In light of the computations shown to be necessary to evaluate and comprehend the

prior art teachings, *see* Finding of Fact No. 43, *supra,* the Court concludes that a general file wrapper indication of searched subclasses is insufficient to uphold a presumption in the face of pertinent prior art classified in such a search area. Second, there have been intentional misrepresentations to the Patent Office which, it has been held, make the findings of the examiner suspect and destroy the presumption of validity. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 470 (D. Del.1966), modified, 374 F.2d 473 (3d Cir.), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967).

### Process Patents

■ 5. Patents may be granted for processes where the conditions of patentability are met:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

Cochrane v. Deener, 94 U.S. (4 Otto.) 780, 788, 24 L.Ed. 139, 141 (1876).

A few years later the Supreme Court again considered processes and pointed out that if the means used are specified in a manner so full and exact that one skilled in the science to which it pertains may, without addition or subtraction, achieve the same results, and the patent is otherwise valid, then the process is valid regardless of how the effect is produced, be it by chemical agency or combination, or by the application of known or unknown principles in natural philosophy. See Tilghman v. Proctor, 102 U.S. (12 Otto.) 707, 727–728, 26 L. Ed. 279, 287 (1881).

■■ The law also protects against a competitor's adoption of a process that operates in substantially the same manner and under the same physical laws to produce the same result as that of the patented process. Tilghman v. Proctor, 102 (U.S. (12 Otto.) 707, 730, 26 L.Ed. 279, 288–289 (1881); Cochrane v. Dener, 94 U.S. (4 Otto.) 780, 786–787, 24 L.Ed. 139, 141 (1877); Mowry v. Whitney, 81 U.S. (14 Wall.) 620, 648, 20 L. Ed. 860, 864–865 (1872). This "doctrine of equivalence" provides protection for a fair range of equivalents depending upon the circumstances which may be commensurate with the scope of the patent. *See* Phillips Petroleum Co. v. Sid Richardson Carbon & Gas Co., 416 F.2d 10, 11 (5th Cir. 1969). *See also* 7 *Deller* § 569. In a crowded art the claim is held to be the measure of the grant and is required to be specific for the very purpose of protecting the public against extension of the scope of the patent. *See* Universal Oil Products Co. v. Globe Oil and Refining Co., 322 U.S. 471, 484–485, 64 S.Ct. 1110, 1116, 88 L. Ed. 1399, 1407 (1943).

### Combination Patents

■ 6. A "combination patent" is one in which none of the parts or components are new, and none are claimed as new; nor is any portion of the combination less than the whole claimed as new or stated to produce any given result. The combination, as arranged in reference to each other, is stated to be the improvement and the thing patented. It is a novel union of old means designed to achieve new ends. Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 520–521, 92 S.Ct. 1700, 1703, 32 L.Ed.2d 273, 276–277 (1972); 1 *Deller* § 71.

In addition to being a process patent, the '437 patent also constitutes a combination patent.

## Improvement Patents

■ 7. Section 101, Title 35, United States Code, authorizes the granting of a patent for "any new and useful improvement" of a process, machine, manufacture or composition of matter. Generally speaking, while improvement may lie in addition, simplification or variance, it must not only be new and useful, but must be "new" in the principles of the process, machine, or manufacture, and not merely in the form or proportions. With regard to a process, "an improvement contemplates some modification of the existing acts or steps, or the addition of other acts to the existing process, in order to achieve a new or improved result". 1 *Deller* § 19 at 131.

Justice Black, in an articulate summary of the law of improvements which appears to be equally valid today, has stated:

> . . . novelty and usefulness are not enough, for to be patentable, improvements 'must, under the Constitution and the statute, amount to an invention or discovery.' And even though improvements produce 'a more convenient and economical mechanism,' or a 'more convenient and salable' product, or a machine of 'greater precision,' they are not patentable if they 'sprang naturally from the expected skill of the maker's calling.' As this Court said in 1875, 'Perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable.'

Williams Manufacturing Co. v. United Shoe Machinery Corp., 316 U.S. 364, 384, 62 S.Ct. 1179, 86 L.Ed. 1537, 1550 (1941) (dissenting opinion).

■ If a new combination and arrangement of known elements produces a new and beneficial result never attained before, such as increased production, this may be evidence of invention. *See* Webster Loom Co. v. Higgins, 105 U.S. (15 Otto) 580, 591–592, 26 L.Ed. 1177, 1181 (1882) (new loom weaving 50–60 yards per day contrasted with usual production of approximately 30 yards). If the only novelty of a process is greater economy, that may be a sufficient improvement. *See* American Wood-Paper Co. v. Fiber Disintegrating Co., 90 U.S. (23 Wall.) 566, 23 L.Ed. 31 (1874). However, if a claimed invention involves only the mere carrying forward or more extended application of an original thought, a change only in form, proportion or degree, or the substitution of equivalents doing substantially the same thing in the same way by substantially the same means with better results, there is not such "invention" as will sustain a patent. Schreyer v. Chicago Motocoil Corp., 118 F.2d 852, 857 (7th Cir. 1941). A slight technological advance in an art, even if useful, is not necessarily entitled to a patent. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 92, 62 S.Ct. 37, 41, 86 L.Ed. 58, 63 (1941); Stabler v. Bright Leaf Industries, Inc., 261 F.2d 383, 385 (5th Cir. 1958), cert. denied, 359 U.S. 960, 79 S.Ct. 799, 3 L.Ed.2d 766 (1959). This principle is equally applicable to the field of chemistry. Dow Chemical Co. v. Coe, 76 U.S.App.D.C. 317, 132 F.2d 577, 585 (1942).

## Anticipation—Prior Art

■ 8. A practical definition of "prior art" is as follows:

> Anything in tangible form that may *properly* be relied upon by the Patent Office under the Patent Statutes and the Patent Office Rules of Practice in Patent Cases in support of a rejection on a matter of substance, not form, of a claim in a pending application for patent.

5 *Deller* § 453 at 361 (1972). As noted by *Deller*, the "field" of prior art under the Patent Act of 1952, and especially under Sections 102 and 103, is very comprehensive and includes: (1) an invention—(a) that was a matter of public knowledge within the United States or in use within the United States by anyone other than the applicant for patent, or (b) patented, or (c) described in a

printed publication anywhere in the world before the invention by the applicant for patent; (2) an invention—(a) patented, or (b) described in a printed publication anywhere in the world, or (c) in public use in the United States, or (d) on sale in the United States more than one year before the date to which the applicant is entitled by actual filing of the application in the United States; (3) an invention first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application in the United States on an application filed in the foreign country more than twelve months before the actual date of filing of the application in the United States; (4) an invention described in a patent on an application for patent by another filed in the United States before the invention thereof by the applicant who is seeking a patent; and, (5) an invention made in the United States by another before the invention thereof by an applicant for United States patent on the same invention, and provided said invention made by another was not abandoned, suppressed, or concealed by him. 5 *Deller* § 453 at 363–64 (1972).

 9. Novelty may be negatived by anticipation, the disclosure in the prior art of a thing, device or process which is identical or substantially the same as the "invention" claimed by the patent at issue. *See, gen.* 1 *Deller* § 57. Anticipation of a contested patent by prior art structures is largely a question of fact. AG PRO, Inc. v. Sakraida, 474 F.2d 167, 171 (5th Cir. 1973).

 10. As a general rule, anticipation of a process patent requires that the prior art disclose, fully and precisely, the essential features of the process at issue. It is necessary to show not only that the prior art might have been used to carry out the process, but that such use was contemplated, or that the leading idea of the prior art was such that the challenged process would have occurred to a mechanic of ordinary skill

in the pertinent art. *See* Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 421–424, 22 S.Ct. 698, 705, 46 L.Ed. 968, 980–981 (1902).

 Prior art that accidentally incorporates the claims of a patent, an incorporation which was not intended and not appreciated, does not constitute anticipation. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 329, 67 L.Ed. 523, 534 (1922); International Nickel Co. v. Ford Motor Co., 166 F.Supp. 551, 560 (S.D.N.Y.1958). Despite apparent similarity to prior art, inventions may be patentable when they perform different functions, produce something in a different way, or produce a substantially different result. Hobbs v. United States Atomic Energy Commission, 451 F.2d 849, 864 (5th Cir. 1971).

 On the other hand, prior art references in combination patent litigation may be combined to anticipate claims where the references suggest to one with ordinary skill in the art doing that which the applicant has claimed. *See* AG PRO, Inc. v. Sakraida, 474 F.2d 167, 171 (5th Cir. 1973); Zero Manufacturing Co. v. Mississippi Milk Producers Association, 358 F.2d 853, 857 n. 4 (5th Cir. 1966), cert. denied, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74; 1 *Deller* §§ 71–72.

 11. The Court holds that the '437 patent was anticipated in printed publications both before the date of the purported invention and more than one year before the application was filed, in contravention to the requirements of 35 U.S.C. §§ 102(a), (b), and is therefore invalid.

*Obviousness*

12. Section 103, Title 35, United States Code, pertaining to the requirement of nonobviousness, provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ 13. Obviousness is a question of law determined against the factual background of the state of the prior art and the claimed improvement on it. AG PRO, Inc. v. Sakraida, 474 F.2d 167, 171 (5th Cir. 1973); Stamicarbon, N. V. v. Escambia Chemical Corp., 430 F.2d 920, 924 (5th Cir. 1970), cert. denied, 400 U. S. 944, 91 S.Ct. 345, 27 L.Ed.2d 248.

■ 14. Obviousness, as an issue, is resolved as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

Anderson's Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258, 262 (1969); Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 556 (1966); AG PRO, Inc., supra, 474 F.2d at 169. Obviousness can only be resolved through reference to the precise facts presented, not through logical or intuitive analysis distorted by the invention's simplicity and retrospective self-evidence or "hindsight". John Deere Co., supra, 383 U.S. at 36, 86 S.Ct. at 703, 15 L.Ed.2d at 566; AG PRO, Inc., supra, 474 F.2d at 169–170.

■ 15. Factors which may shed light upon the issue of obviousness include such secondary considerations as commercial success, long felt but unsolved industry needs, the failure of others, whether others skilled in the art working independently have previously arrived at the same concept and the fact that noted experts in the field express initial disbelief with the new "inven-

tion", Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. at 693, 15 L. Ed.2d at 556; AG PRO, Inc., supra, 474 F.2d at 173–174; Zero Manufacturing Co. v. Mississippi Milk Producers Association, 358 F.2d 853, 857 (5th Cir. 1966), cert. denied, 385 U.S. 841, 87 S. Ct. 93, 17 L.Ed.2d 74.

■ The fact that someone was the first to make a particular product, standing alone, is insufficient for dispelling a conclusion of obviousness. See Zero Manufacturing Co., supra, 358 F.2d at 858 n. 5. It has been noted that the Supreme Court has clearly rejected a prior Fifth Circuit rule that an invention is patentable when it produces an "old result in a cheaper and otherwise more advantageous way". AG PRO, Inc., supra, 474 F.2d at 173. Where those of ordinary skill in the pertinent art have knowledge of the use and value of components used in a combination patent, the fact that the claimed invention may be found by mere mechanical trial and error process may compel a finding that the claimed invention was obvious over prior products. See Inject-O-Meter Manufacturing Co., Inc. v. North Plains Fertilizer and Chemical, Inc., 439 F.2d 1138, 1142 (5th Cir. 1971), cert. denied, 404 U.S. 824, 92 S. Ct. 51, 30 L.Ed.2d 52.

■ 16. Secondary considerations cannot validate the '437 patent if the process which is the subject matter of the patent lacks invention. See Waldron, Inc. v. Alexander Manufacturing Co., 423 F.2d 91, 95 (5th Cir. 1970). Secondary considerations, such as economic success, the alleged failure of others, and copying are irrelevant where anticipation has been found. See, John Deere Co., supra, 383 U.S. at 18, 86 S. Ct. at 694, 15 L.Ed.2d at 556; Railex Corp. v. Speed Check Co., 457 F.2d 1040, 1048–1049 (5th Cir. 1972), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 128.

■ 17. On the record here present, the Court concludes that the subject matter of the '437 patent claims

was obvious at the time that the purported invention was made. The patent is therefore invalid under 35 U.S.C. § 103.

■■■ 18. The obviousness of the claimed subject matter of the '437 patent does not entitle the applicant to a patent even if, arguendo, an unexpected result not previously fully appreciated had been observed. Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 18, 12 S.Ct. 601, 604, 36 L.Ed. 327, 329 (1892); Zero Manufacturing Co., supra, 358 F.2d at 855.

### Preciseness of Description

■■■ 19. Process patents in crowded arts must have a preciseness of description. Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1241 (7th Cir. 1969), cert. denied, 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648. The claims of the '437 patent are separately invalid because they depend upon an alleged discovery of limits or points which do not exist in fact and are merely arbitrarily selected points in a progressive change. Kwik-Set, Inc. v. Welch Grape Juice Co., 86 F.2d 945, 947 (2d Cir. 1936).

■■■ Similarly, the '437 patent is invalid because the claims fail to particularly point out and distinctly claim the purported invention as required by 35 U.S.C. § 112. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402, 1405 (1937).

### Application by Others

■■■ 20. The subject matter patented in the '437 patent was described in patents granted on applications filed by others in this country before the date of the purported invention, and the patent is invalid under 35 U.S.C. § 102(e).

### Product "On Sale"

■■■ 21. Commercial exploitation of an invention earlier than one year prior to filing a patent application precludes patentability, 35 U.S.C. § 102(b), thereby constituting a statutory bar. The purpose of this bar is a public policy aimed at preventing extensions of the effective duration of patent monopolies to inventors who are commercially exploiting the invention without disclosing their invention to the public. Kardulas v. Florida Machine Products Co., 438 F.2d 1118, 1123 (5th Cir. 1971). A single public use, sale, or a placing on sale is sufficient to bar the patent. Id. at 1124; Strong v. General Electric Co., 434 F.2d 1042, 1044 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681. However, the invention that is the subject of the sale must be a reality in the sense that it must be beyond the stage of experimentation; an invention may pass out of the experimental stage and become a reality for purpose of the statutory bar, even though it may later be refined or improved. Hobbs v. United States, Atomic Energy Commission, 451 F.2d 849, 859–861 (5th Cir. 1971). Where it is claimed that the patented product is different or an improvement over the product which was used or sold earlier than one year prior to the filing date, the differences or improvements must themselves be patentable to avoid the Section 102(b) bar. Tool Research and Engineering Corp. v. Hancor Corp., 367 F.2d 449, 454 (9th Cir. 1966), cert. denied, 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972. See also Frantz Manufacturing Co. v. Phenix Manufacturing Co., 457 F.2d 314, 320 (7th Cir. 1972).

■■■ 22. To establish public use or sale under Section 102(b), the defendant in an infringement suit has a heavy burden of proof which must be clear and convincing, a mere preponderance of the evidence being insufficient. Kardulas, supra, 438 F.2d at 1124. Once a prima facie case of such use has been made out, however, the burden of going forward with the evidence shifts to the plaintiff who then must show that the use was an experimental, restricted use; if the plaintiff fails to make such a showing, the invention is deemed to

have been dedicated to the public and therefore to be unpatentable. *Strong, supra,* 434 F.2d at 1044.

■ 23. The '437 patent is invalid because the process claimed in the '437 patent was not patentable over the process commercially practiced and exploited by Borden more than one year prior to the filing date of the '437 application and used for making and selling products.

### Pre-Invention Use By Others

■ 24. The '437 patent is invalid because the subject matter was known and used by others in this country, namely International Minerals and Chemical Corporation, before the date of the purported invention. 35 U.S.C. § 102(a). Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821, 823 (1873); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, 561 (5th Cir. 1970), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264.

### The '436 Patent as Constituting a Patent by "Another"

■ 25. The matter of William A. Kirkland being named as a joint inventor in Patent No. 2,995,436 having been properly called in question in this action, this Court has jurisdiction under 35 U.S.C. § 256 to review the propriety of the issuance by the Patent Office of the Certificate of Correction removing him as a joint inventor. Rival Manufacturing Co. v. Dazey Products Co., 358 F. Supp. 91, 100–101 (W.D.Mo.1973).

■ 26. Upon the facts here presented, the Court concludes that William A. Kirkland was properly named as joint inventor in the '436 patent and that the Certificate of Correction issued by the U. S. Patent Office is invalid.

■ ■ 27. The '436 patent granted on the application of two persons, namely Hollingsworth and Kirkland, constitutes a patent by "another" within the meaning of 35 U.S.C. § 102(e). Application of Land, 368 F.2d 866, 878, 54

CCPA 806 (1966). The subject matter patented in the '437 patent was described in the '436 patent granted on an application filed by "another" in this country before the date of the purported invention, and the patent is therefore invalid under 35 U.S.C. § 102(e). Mamo v. Beverly Manufacturing Co., 315 F.2d 91, 93 (5th Cir. 1963).

### Fraud on the Patent Office

■ 28. Applicants have an "uncompromising duty" of frank and truthful disclosure to the Patent Office. Absolute honesty and good faith disclosure are necessary because of the limited research facilities of the Patent Office, its heavy workload, and its necessary reliance upon that which is presented to it by applicants. *See* Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381, 1388 (1945); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F. 2d 555, 564–565 (5th Cir. 1970), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 27 L. Ed.2d 264. In light of the far-reaching social and economic consequences of a patent which is an exception to the general rule against monopolies, there is a paramount public interest in seeing that such monopolies are free from fraud or other inequitable conduct. *Precision Instrument, supra,* 324 U.S. at 816, 65 S. Ct. at 998, 89 L.Ed. at 1387; Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, 599 (3d Cir. 1972), cert. denied, 407 U. S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 [otherwise stated, the test is whether the applicant for a patent has "displayed that standard of conduct requisite to the maintenance of this suit in equity".]

■ 29. The '437 patent is invalid, and unenforceable because the applicant Hollingsworth did not display that standard of conduct requisite to the issuance of a valid patent.

### Infringement

■ 30. The authorities clearly point out that an invalid patent cannot

**1208**

be infringed. *See, e. g.,* Ralston Purina Co. v. General Foods Corp., 442 F.2d 389, 392 (8th Cir. 1971); 7 *Deller* § 588 and cases cited therein. Upon this theory, the Court concludes that Occidental's process as practiced at Galena Park, Texas, and White Springs, Florida, does not infringe any claims of the '437 patent.

 If the '437 patent were not invalid, then the Court would be compelled to conclude that infringement had occurred, since both processes use substantially the same materials in substantially the same manner to produce substantially the same product. Tilghman v. Proctor, 102 U.S. (12 Otto.) 707, 730, 26 L. Ed. 279, 288–289 (1881); Cochrane v. Deener, 94 U.S. (4 Otto.) 780, 786–787, 24 L.Ed. 139, 141 (1877); Mowry v. Whitney, 81 U.S. (14 Wall.) 620, 648, 20 L.Ed. 860, 864–865 (1872). This patent protection is known as the doctrine of equivalence. *See* Phillips Petroleum Co. v. Sid Richardson Carbon & Gasoline Co., 416 F.2d 10, 11 (5th Cir. 1969). *See also,* 7 *Deller* § 569.

### Attorneys Fees

31. Section 285, Title 35, United States Code, authorizes the award of "reasonable attorney fees to the prevailing party" in "exceptional cases".

32. It has been held that a violation of an applicant's uncompromising duty of full and fair disclosure to the Patent Office, standing alone, is sufficient to convert an infringement action into an "exceptional case", whether the inequitable conduct be actual fraud or conduct short of fraud and in excess of simple negligence. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969). *See also* Penn Yan Boats, Inc. v. Sea Lark Boats, Inc., 359 F.Supp. 948, 968–969 (S.D.Fla.1972), aff'd, 479 F.2d 1328 (5th Cir. 1973) (district court opinion adopted).

 33. Notwithstanding the foregoing, the weight of the law indicates that an award of attorney fees is not lightly made. 8 *Deller* § 760 (1973). Upon full consideration of the record, the Court concludes that it will not award attorney fees.

### Conclusion

34. Defendant is entitled to judgment in conformity with this opinion.

35. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. To the extent that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

36. Counsel will prepare and submit an appropriate judgment for entry within thirty (30) days, incorporating by reference these Findings of Fact and Conclusions of Law and making appropriate provision for allocation of costs and interest.

It is so ordered.